STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re Clyde's Place LLC | } | Docket No. 142-7-07 Vtec |
| (Barry, et al. Notice of Violation) | } | |
| | } | |
| | } | |
| In re Clyde's Place LLC | } | Docket No. 9-1-08 Vtec |
| (Permit Application) | } | |
| | } | |

Decision and Order

In Docket No. 142-7-07 Vtec, Appellant Clyde's Place LLC appealed from a decision of the Development Review Board (DRB) of the Town of Orwell upholding a Notice of Violation issued to its predecessors in interest. In Docket No. 9-1-08 Vtec, Appellant Clyde's Place LLC appealed from a decision of the DRB denying alternative applications for approval either under the nonconforming structure regulations or through a variance. A third related case, Town of Orwell v. Clyde's Place LLC and Barry, No. 17-1-08 Vtec, was placed on inactive status pending the outcome of the two above-captioned cases. Appellant is represented by Karl W. Neuse, Esq. and Benjamin W. Putnam, Esq.; the Town of Orwell is represented by Mark F. Werle, Esq. and Gregory J. Boulbol, Esq.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who took a site visit alone, by agreement of the parties, in the week prior to the trial. The parties were given the opportunity to submit written memoranda and requests for findings, and extended the time for these filings by agreement. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

1

The property at issue in these cases (the Clyde's Place property) is a half-acre lot located on the shore of Lake Champlain in the Town of Orwell. It was located in the Rural Residential zoning district under the 1995 Zoning Bylaws (1995 Bylaws).[1] It is located in the Rural zoning district and in the Shoreland and Flood Hazard overlay zoning districts under the 2007 Land Use Regulations (2007 Regulations). Although it has the address of 420 Mount Independence Road, it has no frontage actually on Mount Independence Road, but instead is accessed by a small private lane or driveway from the public road. The property is approximately 240 feet in length along the shoreline of the lake and approximately 87 feet in width. The property slopes steeply down towards the lake from the east to the west. The traveled way of the small private lane extends from north to south across the property near its easterly boundary. The private lane provides access to another property with an existing house also owned by members of the Barry family.[2]

The Clyde's Place property formerly belonged to Clyde and Anna Blossom. It was acquired by Edward and Laura Barry in 1971 during their ownership of the adjacent parcel, but after the adoption of zoning in Orwell.[3]

---

[1] The 1995 Bylaws replaced a 1986 zoning ordinance. 1995 Bylaws § 125. Neither the 1986 ordinance nor any earlier zoning ordinance has been provided to the Court in connection with these appeals.

[2] No plan or property survey was provided in evidence depicting the adjacent Barry parcel or the location of its house, or whether it has frontage on a public road.

[3] No evidence was presented suggesting what the lot size or setback requirements were in the zoning ordinance at that time, nor whether anything in that ordinance required merger of undersized lots. See, e.g., Appeal of Weeks, 167 Vt. 551, 555 (1998) (explaining that under 24 V.S.A. § 4406(1) merger is not automatically triggered when and if an existing undersized lot is brought into common ownership with an adjoining parcel after the effective date of the ordinance, absent language in the zoning ordinance providing to the contrary). Accordingly, the Clyde's Place property has been treated as a separate, existing small lot, even though at the time of the 2006 permit application

As of the Barrys' acquisition of the Clyde's Place property in 1971, the property contained an existing house, measuring 21' x 21' for the foundation and the enclosed portion of the structure, and having an additional eight-foot-wide open deck extending along the west side of the house at the base of the lake side story.  Due to the slope of the land, the existing deck was supported on posts. A stairway extended down to the lake shore farther west than the deck.  The west edge of the deck extended to 12 feet from the lake shore.   The existing house had side setbacks of approximately 157 feet to the north, 59 feet to the south, and 39 feet to the east.

The existing house had been constructed in the 1940s, well before the adoption of zoning in Orwell.  Because of the slope of the land, the existing house extended one full story plus an attic (1½ stories) above the surface of the ground on the easterly side of the structure, but extended 2½ stories above the surface of the ground on the westerly (lake) side of the structure.

Under the definition of the term "building front line," for a lot fronting on public waters but not on a public road, the building front line is the line parallel to the mean water line transecting the closest point of the building to the mean water line.  1995 Bylaws § 130.  Therefore, under the 1995 Bylaws, the existing house on the Clyde's Place property was nonconforming as to its front yard setback, as the entire property was located within the front yard setback of 100 feet for Rural Residential districts. 1995 Bylaws § 1202(C).  Section 414 of the 1995 Bylaws required that the entire setback area "shall be open from grade level to the sky unobstructed," except for up to two feet of projection of features such as eaves.  The minimum lot area for residential uses in the Rural Residential district was 5 acres, so that the Clyde's Place property was also nonconforming as to its lot size. 1995 Bylaws § 1202(C).

both the application and Zoning Administrator Payne's memorandum to the Planning Commission refer to it as a "guest house" or as a second camp on the (combined) "Barry property."

From their acquisition of the property in 1971 through 2005, the Barry family used the existing house on the Clyde's Place property as a vacation house and fishing camp for family members and their guests, primarily in the summers but also at other times of the year. After the death of Laura Barry in April of 2006, the property passed to Patrick E. Barry (Sr.), Rae Anne Barry, Edna D'Oliva, and Laurette Whittle, the four children of Edward and Laura Barry. The family had been considering replacing the deteriorating existing house on the property for some years, and decided in April or May of 2006 to proceed to do so. The four siblings later conveyed the property to the members of the family who planned to build the replacement house and to be the primary users of it: the six members of Clyde's Place LLC.[4]

Rae Anne Barry and her partner Sharon Thompson live in Orwell near the Clyde's Place property. They were the family members who initially contacted Town officials to discuss the zoning requirements for replacing the existing house under the 1995 Bylaws then in place. In May 2006, Ms. Barry was the trustee of the Laura R. Barry Revocable Trust, which still owned the Clyde's Place property. Ms. Barry and Ms. Thompson met at the property with interim Zoning Administrator Edward Payne in the first half of May 2006, prior to Mr. Payne's writing to the Orwell Planning Commission on May 16, 2006, about information he had understood from that meeting. Ms. Barry was present on the site and involved in the conversation with Ms. Thompson and Mr. Payne.

---

[4] The six members of Clyde's Place LLC are Patrick E. Barry and his wife Kathleen Barry; their son Patrick J. Barry and his wife Grace Barry; and their daughter Margaret Toth and her husband Steven Toth. To avoid confusion, if it is necessary to distinguish between Patrick E. Barry and his son, Patrick J. Barry, they will be referred to as Patrick Barry (Sr.) and Patrick Barry (Jr.), respectively. The four siblings conveyed the property to Clyde's Place LLC in November 2006, although the deed appears to have been recorded on March 1, 2007, at Book 76, Page 400 of the Land Records.

Mr. Payne had been the "interim" Zoning Administrator for approximately four years, although his services as Zoning Administrator were terminated shortly after the site visit, at the end of May or in very early June of 2006. At the site visit, Mr. Payne, Ms. Barry, and Ms. Thompson walked down to the then-existing house to look at its dimensions and condition. Mr. Payne recognized that the structure was "in rough shape" and thought that it would be impractical to rehabilitate. They discussed in a very preliminary way a number of possibilities for replacing the structure, including uses of an overhanging porch or a chalet-style roof, and the possibility of moving it back from the lake.

Mr. Payne observed the enclosed area of the structure and advised them that the existing building could be replaced "in the same footprint" or could be placed farther from the lake. Ms. Thompson asked whether the structure could have overhanging features such as decks around the house, or a roof overhang; Mr. Payne responded that "he didn't see any reason why that would be a problem." It is evident from Mr. Payne's testimony that at the time he did not have in mind that any enclosed portion of the new structure would be supported by overhanging beams, but only thought in terms of open features such as decks, balconies, or a chalet-type roof. However, he did not specifically communicate his idea of what he had in mind by the term footprint. By his encouraging them to replace the structure farther from the lake, and by his statement to the Planning Commission that such a move would make the structure more complying, it is evident that he only considered the property's noncompliance with the 1995 Bylaws to be the distance from the structure west to the lake; he did not consider the property to be noncompliant in that it occupied a certain amount of the required front setback in violation of § 414 of the 1995 Bylaws. Mr. Payne told Ms. Barry and Ms. Thompson that they should file an application when they decided what they wanted to do regarding the Clyde's Place property.

5

Article VII of the 1995 Bylaws allowed noncomplying structures to be maintained and repaired "provided that such action does not increase the degree of non-compliance," but did not allow them to be "moved, extended, or enlarged" unless the then-Zoning Board of Adjustment (ZBA) made certain findings, including that the proposal "is in conformity with the area, yard, coverage, height, and general [b]ylaws of the applicable district." Article VII allowed the ZBA to hold hearings and "attach conditions as deemed necessary."

During the May meeting with Mr. Payne, Ms. Thompson drew a simple sketch plan of the proposed project. It was not drawn to scale, and did not show any property lines or the dimensions of the Clyde's Place property or the setbacks of the existing Clyde's Place house. It also did not correctly show the relationship of the Clyde's Place house to the "private lane," putting it on the same side of the lane as the main Barry house, rather than on the opposite side of the lane, between the lane and the lake. It did not show the location of the lake. It showed the Barry house and three other neighbors' houses. On the sketch, an arrow pointed from text on the sketch to the square on the plan depicting the location of the Clyde's Place house. The text stated in full:

> 21 x 21 footprint
> to be used–
> dug foundation
> 2 stories—existing plumbing & sewage

Mr. Payne did not at that time request any more detailed plans or state that any more information would be required with an application. No signed permit application was filed as dated from that May 2006 site visit.

On May 16, 2006, Mr. Payne inquired as follows regarding the Clyde's Place property in a memorandum to the then-Planning Commission:

6

Laura Barry property has two camps.[5] They want to replace the small white camp on the lakeside. They propose to move back from the lake a few feet. . . . As this would be more compliant it would not require a variance under the existing regulations but in consideration of the new lake zoning should this come before the board?[6]

In late May, shortly after this meeting, Mr. Payne's service as interim Zoning Administrator was terminated; he was replaced by Tina L. Blyther. Ms. Blyther served as Zoning Administrator only from late May into the month of June 2006. By some time in July she had unexpectedly left the area.[7]

While serving as Zoning Administrator, Ms. Blyther contacted Ms. Thompson to discuss the permit application. Ms. Barry, Ms. Thompson, and Ms. Blyther met at the property on June 5, 2006. Ms. Blyther brought the sketch plan previously done by Ms. Thompson and an application form to the property. Ms. Thompson filled out the first page of the application, and Ms. Barry signed it. During the visit, Ms. Blyther measured the existing house, and measured the distance from the house to all four of the property lines. Ms. Blyther took notes, but neither her notes nor her measurements were presented in evidence. Ms. Blyther stated that there was "plenty of room" to the north and south, and room to move the building approximately eight feet to the east, as had

[5] Both Mr. Payne's description and the June 2006 zoning permit application form filed by Rae Ann Barry and Patrick Barry (Sr.), which stated that the present use of the property was "unused dwelling on Barry property," and that the proposed use was for a "guest house [or housing] on Barry property" suggested that the adjoining Barry and Clyde's Place properties were being considered as a single property with two existing dwellings. This Court's November 14, 2008 partial summary judgment decision in Docket No. 9-1-08 Vtec also reflects this understanding. However, at trial both parties treated the properties as separate and not having merged.

[6] The Land Use Regulations adopted on March 6, 2007 (2007 Regulations), evidently had not been proposed for public comment as of this time; if they had been, the proposal should have been considered under the proposed 2007 Regulations. 24 V.S.A. § 4449(d).

[7] Ms. Blyther could not be located by either party during trial preparation, and did not testify at trial.

7

been discussed with Mr. Payne. By her statement regarding the room available on the site to the north, south, and east of the existing house, and by discussing the continued possibility of placing the new structure farther from the lake, it is evident Ms. Blyther also only considered the property's noncompliance with the 1995 Bylaws to be the distance from the structure west to the lake, and did not consider the property to be noncompliant in that it occupied a certain amount of the required front setback in violation of § 414.

During the site visit, Ms. Blyther noticed that the square representing the Clyde's Place house on the sketch plan was on the wrong side of the private lane; either she or Ms. Thompson drew a square on the other side of the lane, crossed out the first square, and extended the arrow from the text to the new square. The notation "[t]his project has been toured by & discussed [with] Edward Payne" also appears on the sketch plan.

The zoning permit application stated as landowners both Rae Anne Barry and Patrick Barry (Sr.), and was signed by Rae Anne Barry dated June 6, 2006. Nevertheless, it was noted by Ms. Blyther as having been received on June 5, 2006, and was signed as issued by her also on June 5, 2006. The proposed use is checked off as "new construction" with the handwritten notation "over existing footprint." The line for "present use" is filled in as "unused dwelling on Barry property." The line for "exact proposed use" is filled in as "guest housing on Barry property." Above the signature line the form states that "[w]hen signing this application, you are certifying that the information you are submitting is correct to the best of your knowledge."[8] The sketch plan was attached to the application form. The second page of the form, constituting the permit, was signed by Ms. Blyther on June 5, 2006, and stated that it "becomes your

---

[8] Neither the form nor the 1995 Bylaws contained any provision voiding the permit in the event of misrepresentation.

8

permit on June 20, 2006 if there is no appeal."[9]  No party appealed the permit, which became final on June 20, 2006.  See 24 V.S.A. § 4472(d).

As submitted, the permit application failed to meet the minimum requirements of § 320 of the 1995 Bylaws, in that it was not drawn to scale and did not indicate the "shape, size, height and location in exact relation to all property lines and to street, road and/or mean water lines" of either the existing structure or the proposed new (or altered, extended, or moved) structure.  Because of these deficiencies, it should have been ruled to be incomplete.  If the required items had been provided, the discrepancy between the Clyde's Place LLC members' understanding of what was allowed by the permit, and the actual requirements of the 1995 Bylaws, could have been realized and corrected before commencement of construction.

In any event, because it was a change to or replacement of an existing nonconforming structure, the application should have been referred to the then-ZBA under Article VII of the 1995 Bylaws, rather than having been acted on by the Zoning Administrator.

However, because the permit was issued and became final, Appellant was entitled to construct what was authorized by the permit, with any ambiguity in interpretation being resolved in favor of the landowner.  See In re: Anne C. Rose Revocable Trust Building permit, No. 290-12-07 Vtec, slip op. at 8 (Vt. Envtl. Ct. Sept. 30, 2008) (Wright, J.) ("Zoning permits, like zoning regulations, must be construed by resolving any ambiguity in favor of the landowner.") (citing ANR v. Weston, 2003 VT 58, ¶ 16, 175 Vt. 573 (mem.)); see also, e.g., Weeks, 167 Vt. at 555 ("[I]n construing land use regulations any uncertainty must be decided in favor of the property owner.") (citing In re Vitale, 151 Vt. 580, 584 (1989)).

---

[9] An associated "Memorandum of Municipal Action," referring to the action as a "Building Permit," was also signed by Ms. Blyther as Zoning Administrator on June 5, 2006, and was recorded by the Assistant Town Clerk in the land records on June 6, 2006.

The permit approved the project as described in the application, including the text on the sketch plan. It required the new construction to be placed "over" the existing 21' x 21' "footprint." It required a dug foundation, that the project would consist of 2 stories, and that it would use the "existing plumbing and sewage" disposal systems serving the existing house. The terms "over" and "footprint" in the permit were ambiguous, as the term "footprint" was not then defined in the 1995 Bylaws, and the permit did not refer to the then-existing foundation or walls of the existing house.[10]

Shortly after the permit was issued, Ms. Thompson and Ms. Barry relayed their understanding of its requirements to Patrick Barry (Sr.), Patrick Barry (Jr.), and Margaret Toth, the members of Clyde's Place LLC who were thereafter actively involved in the design and construction arrangements for the project. Based on their understanding that the permit only required the new house to be built "over" the existing 21' x 21' "footprint," they began conceptual designs of a house that had a superstructure larger than the original 21' x 21' foundation, with the upper floors supported above the surface of the ground by posts or by cantilevered beams.

Zoning Administrator Roland (Ted) Simmons started work on an interim basis in July of 2006, due to the departure of Ms. Blyther. At that time, Mr. Simmons did not

---

[10] Even if the Court were to take judicial notice of the common use of the term "footprint" in the zoning context to refer to the projection of the building onto the ground surface, it would not affect this analysis, as the term is not used in the 1995 Bylaws and there was no evidence of a meeting of the minds as to the term during any of these conversations. In any event, permit conditions do not include the oral representations of the applicant or the zoning administrator, even if made during a hearing. See In re: Anne C. Rose, No. 290-12-07 Vtec, slip op. at 10 (stating that "an oral representation at a hearing is not binding on an applicant unless it is translated into an unambiguous condition of a written ZBA decision") (citing In re Kostenblatt, 161 Vt. 292, 298–99 (1994)).

review recently-issued permits to determine whether he should become familiar with any pending projects or whether any projects required his inspection.

Margaret Toth, one of the members of Clyde's Place LLC, telephoned the Town Clerk in early September of 2006 to discuss the proposed project with Mr. Payne or Ms. Blyther. She was referred to Mr. Simmons and was given his home number to call. She told Mr. Simmons who she was and that the family had been issued a zoning permit and was in the process of designing the house. She explained that the house was limited to a 21' x 21' footprint, and asked whether having the upper floors supported by posts would be viewed as increasing the "footprint." Mr. Simmons advised her that the use of posts to support upper floors or decks would increase the footprint, but that decks or balconies extending outward without being supported on the ground would not increase the footprint.[11] Ms. Toth did not suggest, and Mr. Simmons did not have in mind in his response, the possibility that the ground floor of a new house would be designed to extend out from the foundation on beams located within a few feet of the ground.

Ms. Toth had a second conversation with Mr. Simmons, in October 2006, during which she asked a question regarding the high water mark, unrelated to the issues in the present cases, but during which she reiterated that the project had a permit and was in the design process.

Working with a design professional, Clyde's Place LLC had a cantilevered design prepared that extended the house substantially beyond its preexisting dimensions, by seven feet to the north and south, and three feet to the east. The existing house and foundation were demolished in October of 2006, and ground was broken for the new

---

[11] Issues of whether it was reasonable for Clyde's Place LLC to expend large sums of money towards constructing this project, based upon oral representations of the permittees and of the zoning administrators, and based on a rough sketch plan incorporated in the permit, may be raised in the enforcement case; they are not relevant to either appeal resolved by this decision.

11

foundation in late November of 2006. The final architectural plans for the project were completed at the end of November of 2006. The footings were poured towards the end of December of 2006.[12] Mr. Simmons did not visit the construction site and did not examine the Clyde's Place zoning permit until late March of 2007. Mr. Simmons issued the Notice of Violation that is the subject of Docket No. 142-7-07 on April 23, 2007, alleging a violation of § 414 of the 1995 Bylaws, regulating "projection into required yards."

As constructed, the foundation supporting the steel beams on which the house is cantilevered is several inches larger than original 21' x 21' foundation. In addition, two so-called retaining walls extend beyond the 21' x 21' foundation, to the north and to the south, but are not load bearing. These retaining walls are not yet completely covered by earth, but the project plans call for them to be covered by earth. No evidence was presented as to whether the so-called retaining walls serve a function underground to balance the cantilevered upper portion of the new house.

As stated above, the enclosed volume of the new house extends outward above the ground beyond the 21' x 21' foundation for seven additional feet to the north, three additional feet to the east, and seven additional feet to the south, making the size of the structure 24' x 35', above a walk-out basement level of 21' x 21'. The deck on the west side of the house extends across the entire west side of the house, but extends one foot less towards the lake than did the former deck.

---

[12] Section 360 of the 1995 Bylaws, dealing with certificates of occupancy, requires the Zoning Administrator (Administrative Officer) to "inspect the site at the time the footings are in place and again when the structure is completed . . . before issuing a Certificate of Occupancy." While this section does not require a permittee to notify the Zoning Administrator prior to pouring the footings, a landowner's failure to do so may may make it more difficult to obtain a Certificate of Occupancy.

12

Site work for the project has resulted in changes to the original steep slope of the land. However, due to the current remaining slope of the land, the as-built house extends one full story plus an attic with dormers (1½ stories) above the surface of the ground on the easterly side of the structure, and extends 2½ stories above the surface of the ground on the westerly (lake) side of the structure, as did the former house. The as-built house contains a greater volume and is taller than was the house, but it remains less than 35' in height.

The 2007 Regulations, adopted on March 6, 2007, created a Shoreland Overlay District with a minimum required setback from Lake Champlain of 75 feet, and also reduced the minimum front yard setback for residential lots in the Rural District to 75 feet. 2007 Regulations §§ 2.10, 2.5(D)(6). Section 2.5(D) also established a maximum lot coverage requirement of 5 percent, and reduced the minimum lot size from 5 acres to 2 acres. 2007 Regulations §§ 2.5(D)(10), (1).

Article VII of the 1995 Bylaws allowed non-complying structures to be maintained and repaired "provided that such action does not increase the degree of non-compliance," but did not allow them to be "moved, extended, or enlarged" unless the then-Zoning Board of Adjustment (ZBA) made certain findings, including that the proposal "is in conformity with the area, yard, coverage, height, and general [b]ylaws of the applicable district." Article VII allowed the ZBA to hold hearings and "attach conditions as deemed necessary."

The Environmental Court appeal of the Notice of Violation, Docket No. 142-7-07 Vtec, was held in abeyance for a time, to allow Appellants to apply to the DRB for consideration of the project under the 2007 Regulations, which had for the first time added a waiver provision, § 3.6 of the 2007 Regulations, as authorized by the statutory changes enacted in 2004. See 24 V.S.A. § 4414(8).

However, Patrick Barry (Sr.) submitted a permit application dated August 15, 2007, under a cover letter dated September 11, 2007, requesting approval of the new

13

house as a replacement of the previous noncomplying structure. Appellant's Exh. 21. As initially filed, the application only requested that the DRB consider the application under Article VII of the 1995 Bylaws, on the basis that Zoning Administrator Blyther should have referred it to the then-ZBA for such consideration in June of 2006.

A month after a telephone conference held with the Court in Docket No. 142-7-07, on September 27, 2007, Appellant's attorney sent a letter to the Town's attorney requesting that the pending application be amended to add a request for a variance under § 3.7 of the 2007 Regulations, and to consider the request for approval of the new house as a replacement to a nonconforming structure both under the 1995 Bylaws and under § 4.12 of the 2007 Regulations. Appellant's Exh. 22. No request for a waiver under § 3.6 of the 2007 Regulations was ever made to or ruled on by the DRB.


Section 414 of the 1995 Bylaws—Notice of Violation

Under the 1995 Bylaws, the existing house was nonconforming with regard to the front yard setback. In fact, as the property is only approximately 87 feet wide, the entire property, including the entire existing house, was located within the front yard setback of 100 feet. 1995 Bylaws § 1202(C). Section 414 of the 1995 Bylaws, governing "Projection in Yards," required that "[e]very part of a required yard shall be open from grade level to the sky unobstructed," except for up to two feet of "the ordinary projections of sills, cornices, pilasters, chimneys and eaves."

Article VII of the 1995 Bylaws allowed noncomplying structures to be maintained and repaired "provided that such action does not increase the degree of non-compliance," but did not allow such structures to be "moved, extended, or enlarged" unless the then-ZBA made certain findings, including that the proposal "is in conformity with the area, yard, coverage, height, and general [b]ylaws of the applicable district."

14

As the Appellant's project involved enlarging the structure rather than only maintaining and repairing it, the "degree of non-compliance" issue is inapplicable, and the application should have been forwarded for consideration by the ZBA under Article VII, ¶ 4, or for a variance under Article V. In any event, the noncompliance at issue in this case is the fact that the existing house was occupying a portion of the required front yard setback that is otherwise required by § 414 to be left open from grade level to the sky. The degree of nonconformity was enlarged by the new house, which had a larger volume of structure occupying the required front yard setback, even though it was located one foot farther from the lake. In re: Rouleau Property Appeals, Nos. 231-12-04 Vtec, 28-2-05 Vtec, 29-2-05 Vtec, 192-9-05 Vtec, & 193-9-05 Vtec, slip op. at 6–7 (Vt. Envtl. Ct. Nov. 17, 2006) (Wright, J.) (holding that moving a nonconforming structure within a required setback, to occupy an area that was formerly clear, is impermissible, even if the relocation itself does not create a new violation) (citing In re Appeal of Tucker, No. 123-7-98 Vtec (Vt. Envtl. Ct. Aug. 2, 1999) (Wright, J.), aff'd mem., No. 99-399 (Vt. Mar. 10, 2000) (unpublished mem.)).

Therefore, the Notice of Violation was correct that the new house violated § 414 of the 1995 Bylaws, resolving Docket No. 142-7-07 Vtec.


Equitable Estoppel Against Town

Appellant contends that the Town is precluded from asserting any violation of the bylaws or regulations based on the doctrine of equitable estoppel. The doctrine of equitable estoppel "precludes a party from asserting rights which otherwise may have existed as against another party who has in good faith changed his position in reliance upon earlier representations." In re Lyon, 2005 VT 63, ¶ 16, 178 Vt. 232 (quoting My Sister's Place v. City of Burlington, 139 Vt. 602, 609 (1981)). To establish equitable estoppel four elements must be established:

(1) the party to be estopped must know the facts; (2) the party to be estopped must intend that its conduct shall be acted upon, or the conduct must be such that the party asserting estoppel has a right to believe it is intended to be acted upon; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must detrimentally rely on the conduct of the party to be estopped.

In re Letourneau, 168 Vt. 539, 547 (1998) (citing Agency of Natural Res. v. Godnick, 162 Vt. 588, 592 (1994)).

Furthermore, courts "apply equitable estoppel against the government only in 'rare instances' when the elements of estoppel are met and the injustice that would result from denying the estoppel outweighs the negative impact on public policy that would result from applying estoppel." In re Griffin, 2006 VT 75, ¶ 18, 180 Vt. 589 (mem.) (citing Lakeside Equip. Corp. v. Town of Chester, 2004 VT 84, ¶ 8, 177 Vt. 619 (mem.)). Therefore, in this instance the Town will only be estopped from asserting a violation if Appellant can satisfy all four traditional elements of equitable estoppel, as well as satisfying the "public policy" factor that applies only when estoppel is asserted against a government entity.

In this instance, Appellant is not able to satisfy the first element because it cannot sufficiently demonstrate that the Town knew the relevant facts about Appellant's proposal. While all three of the zoning administrators involved, particularly Ms. Blyther who issued the permit, discussed with Appellant the possibility of having certain features of the house extend out beyond the 21' x 21' footprint, Appellant never disclosed the extent of the intended projection or that the ground floor of the house was proposed to project out over the surface of the land. Rather, the discussion referenced common open features such as decks, balconies, or a chalet-style roof.

As in Town of Bennington v. Hanson-Walbridge Funeral Home, 139 Vt. 288, 293 (1981), the "absence of [full knowledge of what the applicant intended], however innocent the applicant and [however] negligent the [zoning] administrator, precludes

16

the making of a decision on the true facts." Accordingly, because Ms. Blyther was not cognizant of the fact that enclosed portions of the house would extend far beyond the 21′ x 21′ footprint when issuing the permit, and neither were Mr. Payne and Mr. Simmons in their dealings with Appellant, the first element of estoppel cannot be satisfied and Appellants cannot assert the doctrine against the Town.

Appellant also falls short of other required elements of equitable estoppel. As to the third element, that "the party asserting estoppel must be ignorant of the true facts," Appellant contends that even though it was aware of the applicable Bylaws it was "ignorant" of the fact that the design was impermissible under the 1995 Bylaws. However, the fact that Appellant did not recognize the effect of § 414 of the 1995 Bylaws, as it related to Article VII, is a mistake of law rather than a mistake of fact; therefore, Appellant cannot satisfy the third element. The fourth element, regarding Appellant's detrimental reliance, requires that Appellant's reliance be reasonable. See Vt. Structural Steel v. State Dep't of Taxes, 153 Vt. 67, 74 (1989) ("[R]eliance asserted to support estoppel must be reasonable.") (citing My Sister's Place, 139 Vt. at 609). In this instance, Appellant's reliance on the oral statements and conduct of the zoning administrators may not have been reasonable because they were never told that extending the enclosed portion of the home far beyond the 21′ x 21′ footprint was permissible under the 1995 Bylaws. Regardless, whether Appellant's reliance was reasonable is a matter that must be left for the enforcement case. Accordingly, because Appellant cannot satisfy the four traditional elements of equitable estoppel, the doctrine does not apply and the Town is not estopped from asserting a violation.

While the errors of Zoning Administrators Payne and Blyther do not amount to an estoppel, they themselves believed, and conveyed the impression to Appellant's representatives, that the former structure could be moved to the east or extended to the north or south without increasing its degree of nonconformity. Mr. Payne, Ms. Blyther, and Mr. Simmons also conveyed to Appellant's representatives the impression that

17

overhanging decks or upper floor balconies did not count as extensions if they were not supported by posts. Therefore, due to the ambiguities in the interpretation of the zoning permit, the as-built structure remains a nonconforming building, due to the error of Zoning Administrator Tina Blyther in approving an ambiguous permit, as ambiguities must be interpreted in favor of the landowner. See In re: Anne C. Rose, No. 290-12-07 Vtec, slip op. at 8. As a nonconforming building, it is regulated and only allowed to continue as provided in § 4.12; at a minimum it may not increase its degree of nonconformity as provided in that section.

Article VII of 1995 Bylaws and § 4.12 of 2007 Regulations

The proposal did not qualify for approval under Article VII of the 1995 Bylaws for two reasons. First, even if the project could have been construed as the "normal maintenance and repair" of a noncomplying structure, it did increase the degree of noncompliance, that is, the degree to which the required front setback was obstructed from ground level to the sky. Second, the project did not qualify for approval under Article VII, ¶ 4, because the enlarged structure was not in conformity with the front yard requirements of the applicable zoning district.

The proposal does not qualify for approval under § 4.12 of the 2007 Regulations without a § 3.6 waiver, for essentially the same reasons.

While a waiver under § 3.6 is allowed to reduce the dimensional or setback requirements in certain circumstances, Clyde's Place LLC did not apply to the DRB for a waiver under § 3.6, and the DRB in the decision appealed from did not rule on a waiver under § 3.6. Therefore, the issue of whether to approve a waiver or waivers for the new house is not before the Court in this appeal.

Variance

The proposal fails to qualify for a variance under § 510 of the 1995 Bylaws, § 3.7 of the 2007 Regulations, or 24 V.S.A. § 4469(a). All of those provisions require compliance with all five of the general variance criteria to qualify for a variance. The project does not meet the second or the fifth requirement of each of those sections, because the property was developed with a 21' x 21' residential structure which was a reasonable use of the property, and is a smaller deviation from the regulations than is the new house. Therefore, a variance is denied as the proposal fails to meet 1995 Bylaws, §§ 510(2), (5); 2007 Regulations, §§ 3.7(C)(2), (5); and 24 V.S.A. §§ 4469(a)(2), (5).

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that:

The Notice of Violation is upheld; the as-built construction extended the nonconforming structure laterally and in terms of volume so that it occupied more area and volume of the 100-foot front (lake) setback than had been occupied by the prior building. Any issues as to a remedy or penalty for the violation are beyond the scope of the two cases resolved by this decision, and must be addressed in Town of Orwell v. Clyde's Place LLC and Barry, Docket No. 17-1-08 Vtec.

Appellant-Applicant's application for a zoning permit for the as-built structure as a repair of or enlargement of a noncomplying structure, either under Article VII of the 1995 Bylaws or under § 4.12 of the 2007 regulations, is denied.

Appellant-Applicant's application for a variance for the as-built structure is denied, as it fails to meet the requirements of either § 510 of the 1995 Bylaws, § 3.7 of the 2007 Regulations, or the state statute, 24 V.S.A. § 4469(a), as discussed above.

19

As no application for waiver under § 3.6 of the 2007 Regulations was ever made by Appellant-Applicant or ruled on by the DRB, the eligibility of the as-built structure for such a waiver is not before the Court in either of the present appeals.

This decision resolves both above-captioned appeals. A telephone conference has been scheduled (see enclosed notice) to discuss how the parties would like to proceed in the enforcement case, Town of Orwell v. Clyde's Place LLC and Barry, Docket No. 17-1-08 Vtec.

Done at Berlin, Vermont, this 15th day of December, 2009.

_____

Merideth Wright
Environmental Judge