2003 VT 58

## AGENCY OF NATURAL RESOURCES v. Don WESTON

[830 A.2d 92]

No. 02-456

¶ 1. June 18, 2003. Defendant Don Weston appeals from the environmental court's order fining him approximately $15,000 for violating solid waste regulations and a condition of his Act 250 land use permit. We affirm the violations, but reverse the penalty imposed for the permit violation and remand the matter for reconsideration of the appropriate fine for the transgression.

¶ 2. Defendant owns and operates an excavating business. In March 1989, he purchased 146 acres of undeveloped land that was subject to an Act 250 permit. Seven months earlier, the seller of part of the land had obtained the permit to allow him to subdivide the property. The permit had been denied twice before because of the applicant's failure to demonstrate that the proposed subdivision would "not significantly reduce the agricultural potential of the primary agricultural soils." 10 V.S.A. § 6086(a)(9)(B); see 10 V.S.A. § 6001(15) ("Primary agricultural soils" are soils having potential "for growing food and forage crops"). The permit was finally granted when the applicant con-

solidated the areas to be set aside for agricultural use into a single thirty-three-acre parcel. Among the conditions of the permit were the following:

> 17. The 33 acres of primary agricultural soils ... shall be maintained as open, cleared, uncluttered and unencumbered land. Activities which will reduce the potential of the soils for agricultural use, such as the construction of buildings or swimming pools, are prohibited. At a minimum, the owner ... or the lessee of the Agricultural Area ... shall cut the hay from the Agricultural Area twice each year and shall fertilize this area at least once every three years.

> 18. A multiple year lease arrangement shall be made available by the owner ... to a farmer for a commercial farming practice utilizing the Agricultural Area. The condition of the lease shall in no way inhibit the responsible use of fertilizer, reseeding or other appropriate improvements for the enhancement of the agricultural potential for the soils on the site. This lease shall be for a minimum term of five years, renewable for five year periods at the end of each term.

¶ 3. From 1989 to 1999, in compliance with these permit conditions, defendant leased the thirty-three-acre parcel to local farmers, who planted corn and cut hay. In 1999, defendant applied for a permit to develop his property. Neighbors opposed the proposal, and the application was denied.

¶ 4. In the summer of 2000, defendant dumped three loads of chicken manure on the thirty-three-acre parcel near the property line with residents who had opposed his development proposal. Some of the residents complained to local and state officials about the odor and other problems associated with the manure. The Jericho town health officer inspected the manure pile in August 2000 and then contacted officials from the Department of Agriculture, who inspected the property in August and again in November 2000. Following the August visit, the agricultural investigator found no violation, concluding that the pile looked like normal chicken manure, and that stacking manure for late spreading was a normal agricultural practice. The investigator noted, however, that the field had not been cut in some time, and that there was a high weed content in the hay.

¶ 5. At their November visit, state agricultural officials noted that the field was old corn stubble and overgrown weeds that had not been cut. The field did not appear to have been used for any agricultural production during the summer 2000 growing season. The officials met with defendant and explained to him that he needed to take a crop from his land to keep it in agricultural use and legitimize the stacking of manure for fertilizer. The officials further advised Weston that the manure pile had to be spread before December 15 of that year, and that the storage of manure without an agricultural use is a solid waste violation. Late on December 14, the last day of the year on which the rules for acceptable agricultural practices allowed the spreading of manure, defendant had a local farmer spread the manure.

¶ 6. In the summer of 2001, defendant delivered another two loads of chicken manure to the thirty-three-acre parcel, again dumping it near the residential properties. In response to more complaints from the neighbors, the same agricultural investigator from the previous year visited the property on a number of occasions. Concluding that the parcel was not being put to any agricultural use, the investigator referred the matter to plaintiff Agency of Natural

Resources for possible solid waste violations. An environmental enforcement officer from the Agency visited defendant's property on August 28 and September 4, 2001. Defendant told the officer that he would be bringing in another two loads and spreading the manure within two weeks in preparation for crop planting the following year. On September 19, after determining that defendant had not spread the manure pile, the officer issued defendant a notice of violation for storage of a solid waste without a permit, and ordered him to remove the pile by September 28.

¶ 7. That same month, the Commissioner of the Department of Agriculture wrote the Town of Jericho health officer a letter stating that because no farming practices had occurred on defendant's property in the past two years, the Department had concluded that the property was not being used for an agricultural operation, and thus the Town could regulate the storage of manure. On October 1, the Jericho health officer issued a health order directing defendant to remove the manure pile. Defendant had a local farmer spread the manure later that month.

¶ 8. On April 29, 2002, the Agency of Natural Resources issued an administrative order finding that defendant (1) had violated Condition 17 of his Act 250 permit by failing to cut hay on the thirty-three-acre parcel in accordance with the permit; and (2) had violated 6-302(d) of Vermont's Solid Waste Management Rules by storing solid waste (chicken manure) for an extended period of time outside a certified facility without distributing the manure as fertilizer. The order required defendant (1) to pay a $2000 penalty within thirty days; (2) to plow and seed the thirty-three-acre parcel by June 1, 2002; (3) to refrain from disposing of chicken waste, including chicken manure, on the property, and to follow the Department's accepted agricultural practices when fertilizing the

soil; and (4) to abide by the conditions of the Act 250 permit, including Condition 17's requirement that hay be cut twice each year on the parcel. The order also stated that the $2000 fine could be augmented depending on evidence presented at a hearing before the environmental court, should defendant request one.

¶ 9. Defendant appealed the administrative order to the environmental court, which held a hearing on July 10, 2002. Following the hearing, the court determined that (1) defendant violated Condition 17 of his Act 250 permit by failing either to cut hay in the years 2000 and 2001 or to seek a minor permit amendment to allow him to forego cutting hay for one or both of those years; and (2) defendant violated Solid Waste Management Rule 6-302(d), which prohibits the storage of a solid waste outside a certified facility, by stacking chicken manure without using it for soil enrichment. The court modified one of the provisions of the administrative order to allow the use of manure but not chicken waste, and then imposed a $14,640 penalty based on avoided costs — $14,000 for the cost avoided in not having to cut hay twice a year for two years, and $640 for the cost of removing the manure pile in 2000 and 2001.

¶ 10. On appeal, defendant argues that (1) the environmental court's findings concerning the presence of chicken carcasses in the manure as well as the odor and flies resulting from the chicken waste were unsupported by the evidence and outside the court's jurisdiction because they were unrelated to the issues before the court; (2) the court misinterpreted Condition 17 to require defendant to cut hay twice a year regardless of the physical condition of the land or the use of the land for other agricultural activities; (3) the court misconstrued the solid waste management rules to prohibit the extended field stacking of manure; and (4) the court abused its discretion in

assessing the penalty for the permit violation.

¶ 11. Defendant first contends that we must vacate the environmental court's findings that were made in excess of its jurisdiction. According to defendant, the court's findings concerning the presence of animal carcasses in the manure, the strong odor and number of flies generated by the manure, and the timing of the deliveries of the manure to maximize the neighbors' annoyance were all unrelated to the issues before court — whether defendant violated his Act 250 permit by failing to cut hay twice a year and whether he stacked manure in violation of solid waste management rules. Defendant surmises that the court made the challenged findings for the sole purpose of supporting its advisory opinion that defendant's neighbors might have a private nuisance action against him. He contends not only that these findings are extra-jurisdictional, but also that they are unsupported by the evidence presented at the hearing.

¶ 12. We decline to address these arguments. The challenged findings may not have been relevant to the alleged violations at issue in the environmental court hearing, but, in any event, they played no part in the court's disposition of the matter. The penalties imposed by the court were expressly tied to avoided costs, and were not increased based on any finding of malicious or wilful behavior. Although the court modified the administrative order to prohibit defendant from storing or using chicken waste other than chicken manure, defendant has not suggested that he should be permitted to use chicken waste as fertilizer, and thus that prohibition is innocuous. In short, we decline to review the challenged findings because they had no negative impact on defendant with respect to the environmental court order on appeal here.

¶ 13. Next, defendant argues that the environmental court erred by construing the solid waste management rules to prohibit the long-term field stacking of manure. Vermont's solid waste management rules prohibit the "storage or disposal of solid waste outside of a certified facility," Rule 6-302(d), 8 Code of Vermont Rules 12 036 003-15-16 (2002), but exclude from the definition of solid waste "animal manure and absorbent bedding used for soil enrichment." Rule 6-201, 8 Code of Vermont Rules 12 036 003-11 (2002); 10 V.S.A. § 6602(2) (same definition). According to defendant, he did not violate those rules because the evidence demonstrated that (1) it is common practice for farmers to stack manure for long periods of time; (2) the regulations do not limit the time period for the stacking of manure; and (3) in this case, he eventually used the manure for soil enrichment.

¶ 14. We find these arguments unavailing. The environmental court found incredible defendant's claim to have used the manure for soil enrichment, given that (1) there was too little manure to enrich the soil of a field the size of the parcel in question; (2) the manure was spread as late as possible in the fall after the growing season; (3) none of the reasons for stacking manure long term existed in this case; and (4) no crops were planted on the parcel until late in the 2002 growing season, approximately one week before the environmental court hearing was held. The evidence supports these findings, see *Vt. Agency of Natural Res. v. Bean*, 164 Vt. 438, 443, 672 A.2d 469, 472 (1995) (trial court findings will stand as long as there is reasonable and credible evidence to support them), and, given the specific circumstances of this case, the findings support the court's conclusion that the manure was not used for soil enrichment. Accordingly, the court did not err in determining that defendant had violated the solid waste management rules.

¶ 15. Defendant also argues that the environmental court misinterpreted Condition 17 of his Act 250 permit in

determining that he violated the condition by not cutting hay for two years. In defendant's view, the purpose of Condition 17 is simply to assure that the thirty-three-acre parcel is left open and its soil kept arable for agricultural purposes. He asserts that by fertilizing the soil and allowing a neighbor to pasture horses during 2000 and 2001, he satisfied Condition 17 without having to cut hay. We agree with defendant that the environmental court appears to have misconstrued Condition 17, but, nonetheless, we uphold the court's determination that he violated the permit condition.

¶ 16. In construing permit conditions, we rely upon normal rules of statutory construction. See *Sec'y, Vt. Agency of Natural Res. v. Handy Family Enters.*, 163 Vt. 476, 481, 660 A.2d 309, 312 (1995). Our principal concern is "to implement the intent of the draftpersons." *Id.* Ordinarily, we do so by accepting the plain meaning of the words because we presume that they express the underlying intent. *Id.* We also keep in mind, however, that because land-use regulations are in derogation of property rights, any uncertainty in their meaning must be decided in favor of the property owner. *Id.* at 481-82, 660 A.2d at 312. We must be "particularly careful" that the conduct complained of "falls within the clear prohibition of a permit condition before requiring the landowner to pay a large monetary penalty." *Id.* at 482, 660 A.2d at 313. Finally, we must accord deference to the environmental court's construction of a permit condition, particularly when the court's expertise will assure consistent interpretations of the law. *Id.*

¶ 17. With these considerations in mind, we examine Condition 17. The primary objective stated in Condition 17 is to maintain the thirty-three-acre parcel "as open, cleared, uncluttered and unencumbered land." The condition then sets forth examples of prohibited activities that would interfere with this objective by reducing the "potential" for agri-cultural use — "the construction of buildings or swimming pools." Finally, the condition states that, "[a]t a minimum," the owner or lessee of the parcel "shall cut the hay from the [parcel] twice each year and shall fertilize this area at least once every three years." Read in its entirety, and keeping in mind that uncertainties must be read in favor of defendant, we do not construe Condition 17, as the environmental court apparently did, to require that hay be cut twice a year notwithstanding the condition of the land or other agricultural uses to which it is being put. Rather, we conclude that Condition 17 is intended to require defendant to keep the property open and available for agricultural use, so that if it is not being put to any other agricultural use that preserves the agricultural soils, it must, at minimum, be hayed and fertilized in a manner that maintains it as arable land.

¶ 18. Here, in claiming that the court erred by finding that he violated Condition 17, defendant relies on evidence indicating that (1) he has always kept the parcel open and available for agricultural use; (2) between 1989 and 1999, he leased the parcel to two brothers who planted and harvested corn and cut hay; (3) he allowed a neighbor to graze horses on the parcel from the 1990s until 2002, when the neighbor moved; (4) he learned late in the 2000 growing season that, after one of the brothers who had farmed the land died, the other brother decided not to continue to farm the land; (5) he attempted, initially without success, to find someone to farm the land; and (6) he finally found a farmer who agreed to do so, but the farmer wound up not planting anything during the 2001 growing season because of severe drought conditions.

¶ 19. Although this evidence may mitigate any penalty resulting from the violation, it does not demonstrate that the court erred by finding a violation. The pasturing of horses is certainly an agricultural use that has the potential to

satisfy Condition 17 without the need to cut hay. See 10 V.S.A. § 6001(15), (22)(B) (defining "Primary agricultural soils" as soils with "potential for growing food and forage crops," and including "the raising, feeding or management of livestock" in definition of "Farming").* But the reports submitted by the agricultural investigator consistently noted that, over the two-year period for which defendant was fined, the parcel (1) did not appear to have been put to any agricultural use, and (2) had "grown up" into a mixture of old corn stubble, hay, grass, and weeds. This evidence supports the environmental court's finding of a violation of Condition 17, albeit a minor one with mitigating circumstances that the court failed to acknowledge.

¶ 20. Finally, defendant argues that the environmental court erred in assessing the $14,000 penalty for the permit violation by failing to take into account mitigating circumstances and the fact that he did not profit from not having hayed the field for two years. The latter argument is without merit in that it ignores the trial court's unchallenged finding that defendant realized an economic gain through the avoided costs of not having to pay someone to cut hay that was not worth selling. Cf. *Sec'y, Vt. Agency of Natural Res. v. Irish*, 169 Vt. 407, 418, 738 A.2d 571, 580 (1999) (upholding penalty imposed based on avoided cost of not having to hire wetland consultant); *Agency of Natural Res. v. Godnick*, 162 Vt. 588, 597, 652 A.2d 988, 994 (1994) (upholding penalty imposed

based on avoided cost of delaying landscaping work for one year).

¶ 21. We agree, however, that the environmental court imposed an excessive penalty after failing to take into consideration the mitigating circumstances. Cf. *Godnick*, 162 Vt. at 596, 652 A.2d at 994 (environmental law division must consider mitigating circumstances in assessing penalty). In so concluding, we emphasize that this administrative enforcement action does not concern the private nuisance dispute between defendant and his neighbors, which apparently is pending in the superior court. Rather, this case concerns solely the permit and regulation violations alleged by the Agency of Natural Resources. As noted, defendant presented undisputed evidence that (1) he did not learn until late in the 2000 growing season that one of the persons who had farmed the field for the past decade had decided not to continue to do so after the death of his brother; (2) he made a concerted effort to find another farmer to farm the field, and finally found someone who decided not to plant a crop in 2001 because of the severe, early-season drought conditions; and (3) that same farmer intended to plant corn in 2002, and finally did so late in the season because of the wet weather.

¶ 22. Apparently, the court declined to consider these facts as mitigating circumstances because defendant failed to apply for a minor permit amendment. Given the ambiguities in the language of Condition 17, we do not find this omission to be a major infraction of the permit. Further, while we recognize that the court imposed the penalty based on defendant's failure to hay the property twice for two years, Condition 17 does not necessarily require such action.

¶ 23. The environmental court arrived at the $14,000 penalty by relying on testimony that (1) one might typically get 3500 or 4000 bales of hay from a field the size of defendant's parcel; and (2) if the hay on a field was not worth selling, the

---

* We find unavailing the State's argument that Condition 18 of defendant's Act 250 permit demonstrates that the grazing of animals may not supersede the minimum haying requirement set forth in Condition 17. Condition 18 requires only that a lease arrangement "be made available" for a commercial farming practice.

farmer would charge $1.50 per bale to cut down the field. Yet, the same farmer who provided that testimony also testified that the thirty-three-acre parcel had little or no hay value because of its weed content, and that, in any event, it would not have made sense to hay the parcel twice, if at all, during the 2001 drought year.

¶ 24. Although we defer to the environmental court to weigh mitigating factors in assessing penalties, see *Bean*, 164 Vt. at 445, 672 A.2d at 473; *Godnick*, 162 Vt. at 597, 652 A.2d at 994, we conclude that the penalty imposed in this case for the permit violation was grossly out of line with the nature and degree of the violation, particularly given the mitigating circumstances. As noted above, the State failed to demonstrate that defendant did anything to undermine the principal purpose behind Condition 17 — to assure that the thirty-three-acre parcel remained open, unencumbered, and available for agricultural use. Indeed, the evidence indicated that the land remains open and available for agricultural use, and that defendant made efforts to have the parcel farmed. The permit condition did not necessarily require that hay be cut twice a year, and in fact the testimony was that cutting hay twice would have been impractical during at least one of the years for which the penalty was imposed. Finally, there was no testimony to support the court's conclusion that it would have cost $14,000 to hay that particular parcel, in its condition, in those particular years — including the drought year — in a manner that would have protected the field for future agricultural use.

¶ 25. In short, under the circumstances of this case, the penalty imposed by the environmental court for the permit violation — which was seven times the amount initially imposed by the Agency — was excessive. Accordingly, we remand the matter for the court to reconsider the penalty imposed for this relatively minor permit violation.

*The violations found by the environmental court in its September 25, 2002 order are affirmed. The penalty imposed for the solid waste violations is affirmed. The penalty imposed for the permit violation is reversed, and the matter is remanded for reassessment of that penalty in light of this opinion.*