2011 VT 7

**In re Barry (Clyde's Place LLC) NOV**

**In re Clyde's Place LLC Application (Existing Structure)**

[16 A.3d 613]

No. 10-013

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed January 21, 2011

*Karl W. Neuse* and *Benjamin W. Putnam* of *Neuse, Duprey & Putnam, P.C.*, Middlebury, for Appellant.

*Mark F. Werle* and *Greg J. Boulbol* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Appellee.

¶ 1. **Reiber, C.J.** Landowner Clyde's Place LLC appeals the Environmental Court's decisions (1) upholding the Town of Orwell's notice of violation (NOV) as to landowner's replacement nonconforming structure and (2) denying landowner's application for a new permit or variance for the as-built structure. Notwithstanding the court's determination that the new structure violated certain Town bylaws, we conclude that landowner was entitled to judgment in its favor based on court findings and conclusions indicating that the new structure was consistent with landowner's original permit, which contained ambiguous terms that had to be construed favorably to landowner. Accordingly, we reverse the Environmental Court's decision and remand the matter for the court to enter judgment for landowner.

¶ 2. The property at issue in this appeal is a half-acre lot located on the shores of Lake Champlain in the Town of Orwell. The property runs 240' along the shoreline and slopes steeply down toward the lake 87' from east to west. A house was built on the property in the 1940s, long before the adoption of zoning in Orwell. Because of the slope of the land, the original house was one-and-one-half stories above the ground on the easterly side and

two-and-one-half stories, including the basement, above the ground on the westerly side toward the lake. An open deck, supported on posts with a stairway descending to the west toward the lake shore, extended 8' from the 21' by 21' structure. The west edge of the deck was 12' from the lake shore, with setbacks of 39' to the east, 157' to the north, and 59' to the south. The court concluded that the existing house was nonconforming as to its front setback because the entire property was within the 100' requirement for Rural Residential districts under the Town's zoning bylaws adopted in 1995.

¶ 3. Edward and Laura Barry acquired the subject property in 1971. The Barry family used the then-existing structure as a vacation house and fishing camp for family members and their guests, primarily in the summers but also at other times of the year. In the spring of 2006, the Barry children inherited the property and conveyed it to the current owner, Clyde's Place LLC, a corporation consisting of the six members of the family who planned to replace the deteriorating house and to be the primary users of the new replacement house.

¶ 4. Rae Anne Barry and her partner Sharon Thompson were the two members of Clyde's Place who initially contacted the Town to discuss the zoning requirements for replacing the existing home with a new structure under the 1995 zoning bylaws then in place. In May 2006, the two women met at the property with the interim zoning administrator, Edward Payne. Mr. Payne recognized that it would be difficult to rehabilitate the structure, which was "in rough shape." He discussed with the couple "in a very preliminary way" some possibilities for replacing the building, and told them that overhanging features such as decks or a roof were okay — "he didn't see any reason why that would be a problem." Mr. Payne advised the couple that the existing building could be replaced "in the same footprint" or could be placed farther from the lake.

¶ 5. During the meeting with Mr. Payne, Ms. Thompson drew a simple sketch plan of the proposed project. It was not drawn to scale and did not show any dimensions or property line setbacks. The text on the drawing stated in full: "21 x 21 footprint to be used — dug foundation, 2 stories — existing plumbing & sewage." Mr. Payne did not request any more detailed plans or indicate that any more information would be required with the application. No signed application was filed at that point.

¶ 6. Shortly after this meeting, Mr. Payne sent a memo to the Orwell Planning Commission in which he referenced only the 100' lakefront setback. He told the couple they should file an application for a permit.

¶ 7. Mr. Payne had been interim zoning administrator for four years but was terminated shortly after the May 2006 site visit. Tina Blyther took over as the Town's zoning administrator, a position that she held for about one month. She unexpectedly left the area in July and could not be located by either party and did not testify at trial.

¶ 8. On June 5, 2006, Ms. Blyther met with Ms. Thompson and Ms. Barry at the property. Ms. Blyther took notes and made measurements of the house and the setbacks, but these were not introduced at trial. Ms. Blyther brought to the site visit the sketch plan previously done by Ms. Thompson for Mr. Payne, as well as a permit application form. She requested no additional detail for the sketch plan, but she relocated the house on the plan to accurately depict it on the other side of the private lane. Ms. Thompson filled out the first page of the application form, and Ms. Barry signed it. As the court found, Ms. Blyther stated to Ms. Thompson and Ms. Barry during their meeting that there was "plenty of room" to the north and south within the allowed setbacks, and also room to move the building another 8' to the east, as the couple had discussed with Mr. Payne. Moreover, as with Mr. Payne, the court concluded that Ms. Blyther, by her statements referencing only the distance from the lake, indicated that she did not consider the property to be out of compliance with the 1995 zoning bylaws except as to the lakefront setback.

¶ 9. During her meeting at the property with Ms. Thompson and Ms. Barry, Ms. Blyther noted on the sketch plan that Mr. Payne had "toured" and "discussed" the project. Ms. Blyther approved the project and issued the zoning permit to Clyde's Place that same day. On the application, the proposed use was checked off as "New Construction" with the handwritten notation "over existing footprint." The sketch plan was attached to the application form. The second page of the form, constituting the permit, was signed by Ms. Blyther on June 5, 2006 and stated that "this application becomes your permit on *June 20, 2006* if there is no appeal." No party appealed the permit, which became final on June 20, 2006.

¶ 10. Though approved, the permit was faulty in at least two respects. First, the application failed to satisfy zoning bylaws requiring sketch plans to be drawn to scale with dimensions indicating the shape, size, height, and location of the existing and proposed structures in relation to all property lines. Second, because the application proposed a change to, or replacement of, a preexisting nonconforming structure, it should have been submitted to the zoning board of adjustment for approval. The bylaws required that such a request be forwarded to the board for consideration rather than be acted upon by the zoning administrator alone. As the Environmental Court concluded, however, the permit served as the Town's approval of the application, including the sketch plan, and thus the permit applicant was entitled to construct what was authorized by the permit, with any ambiguity resolved in favor of the landowner.

¶ 11. Shortly after the permit was issued, Ms. Thompson and Ms. Barry relayed their understanding of its requirements to other members of Clyde's Place who were actively involved in the design and construction arrangements for the project. Based on their understanding that the permit required that the new house be built "over" the existing "footprint," they began conceptual designs of a house that had a superstructure larger than the original foundation, with upper floors supported above the surface of the ground by posts or cantilevered beams.

¶ 12. In July 2006, after Ms. Blyther's unexpected departure, Roland Simmons began work as the Town's third interim zoning administrator during these permit discussions. In September 2006, Margaret Toth, one of the members of Clyde's Place, called the Town to discuss the proposed project. She asked Mr. Simmons whether having upper floors supported by posts would be viewed as increasing the footprint, but did not specifically suggest the possibility that the ground floor of the new house would be designed to extend out from the foundation on beams located within a few feet of the ground. Mr. Simmons advised Ms. Toth that the use of posts to support upper floors or decks would increase the footprint, but that decks or balconies extending outward without being supported on the ground would not increase the footprint. Mr. Simmons did not visit the site and did not examine the already-issued zoning permit until late March 2007.

¶ 13. The preexisting building and foundation were demolished in October 2006, and ground was broken for a new foundation in

November 2006. The final architectural plans, which featured a cantilevered design, extended the upper floors of the house 7' to the north and south and 3' to the east, but the deck on the west side was 1' further from the lake than the preexisting house. Thus, the plans called for a structure with upper floors extending 24' by 35' over a foundation measuring within a few inches of the 21' by 21' dimensions of the original footprint. The footings for the new house were poured towards the end of December 2006, and the structure was substantially built by early spring of 2007.

¶ 14. Like the original house, the new house extends one-and-one-half stories above the ground on the easterly side away from the lake and two-and-one-half stories, including the walkout basement, on the westerly side toward the lake. Unlike the original house, however, the new house has dormers extending out from the top story. As built, the house is less than the maximum 35' in height allowed by the bylaws.

¶ 15. On April 23, 2007, following a visit at the construction site, zoning administrator Simmons issued an NOV, alleging that the new construction violated Article IV, Section 414 of the Town's zoning bylaws related to required lakefront setback. According to the NOV, "[t]he violation exists as follows: Article IV, Section 414, Projection into required yards [setback from Lake front (front yard) with no access on public road] 100 ft. front yard setback for residential use." Thus, consistent with Mr. Payne's memo to the Orwell Planning Commission and Ms. Blyther's statements to Ms. Thompson and Ms. Barry, the NOV noticed a violation of only the 100 lakefront setback requirement. At the point the NOV was issued, the project was nearly done.

¶ 16. Landowner appealed the NOV to the Town's Development Review Board (DRB). The DRB denied the appeal, and landowner then appealed to the Environmental Court. Meanwhile, landowner filed a new permit application, which the Town considered under new zoning bylaws adopted in March 2007. The court placed the NOV appeal on inactive status pending resolution of the new permit application. The DRB denied the new application in December 2007. Landowner again appealed to the Environmental Court, which consolidated the new appeal with the pending NOV appeal. The matter proceeded to trial over two days in March 2009. In a December 15, 2009 decision, the court upheld the NOV and rejected the new application seeking approval for the house either as a noncomplying structure or by means of a variance.

¶ 17. In its appeal, landowner argues that (1) the court erred in upholding the NOV in light of its findings and conclusions indicating that the new structure was in compliance with the original 2006 permit and thus qualifies as a lawful nonconforming structure; and (2) in the alternative, the court erred by denying landowner's request for approval of the structure as a valid modification of the preexisting nonconforming structure, by declining to hold that the Town was estopped from asserting a violation, by denying landowner's request for a variance, and by declining to find a deemed approval of the variance application as a remedy for procedural errors committed by the DRB. Because we agree with landowner's first argument and reverse the court's judgment on that point, we do not address the other arguments.

■ ■ ¶ 18. As the Environmental Court stated, "because the [2006] permit was issued and became final, [landowner] was entitled to construct what was authorized by the permit, with any ambiguity in [its] interpretation being resolved in favor of the landowner." Indeed, a zoning permit that has become final cannot be collaterally attacked even based on arguments that it was void on the grounds that the zoning administrator lacked the authority to issue it. *Levy v. Town of St. Albans Zoning Bd. of Adjustment*, 152 Vt. 139, 142-43, 564 A.2d 1361, 1363-64 (1989); see *Town of Bennington v. Hanson-Walbridge Funeral Home, Inc.*, 139 Vt. 288, 293, 427 A.2d 365, 368-69 (1981) ("The use applied for and contemplated by the zoning permit must . . . stand unchallenged.").

■ ¶ 19. A municipality may later argue, however, "that the bounds of permitted use have been exceeded." *Hanson-Walbridge Funeral Home, Inc.*, 139 Vt. at 292, 427 A.2d at 368; cf. *In re Kostenblatt*, 161 Vt. 292, 301, 640 A.2d 39, 45 (1994) (noting that enforcement of requirements of bylaws is not collateral attack on permit). In construing a zoning permit, "we rely upon normal rules of statutory construction." *Agency of Natural Res. v. Weston*, 2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.). We ordinarily accept the plain meaning of the words contained in a zoning permit, but any uncertainty in the meaning of those words "must be decided in favor of the property owner" because land-use permits are in derogation of property rights. *Id.* We must also accord deference to the Environmental Court's interpretation of the permit. *Id.*

¶ 20. Here, the Environmental Court noted that "[t]he permit approved the project as described in the application, including the text on the sketch plan," which required the new construction to be placed "over" the 21' by 21' "footprint" of the old structure. The court found ambiguity in the permit terms "over" and "footprint" because those terms were not defined in the 1995 bylaws and "the permit did not refer to the then-existing foundation or walls" of the old structure. Accordingly, the court concluded later in its decision, in addressing landowner's equitable estoppel argument, that "the as-built structure remains a nonconforming building" insofar as ambiguities in the permit resulting from its uncertain terms and the actions of the zoning administrator must be construed in favor of the landowner. See 24 V.S.A. § 4303(13) (defining "nonconforming lots or parcels" to include those improperly authorized as result of error by administrative officer). Given these findings and conclusions, which are supported by the record, we agree with landowner that, rather than going on to find a violation of town bylaws, the court should have stricken the Town's NOV and entered judgment in favor of landowner because the as-built structure was allowed by the ambiguous permit.

¶ 21. This case is not controlled by *Kostenblatt*. There, we declined to subject the landowner to certain conditions not explicitly stated in his permit, but nevertheless upheld the town's NOV with respect to zoning requirements imposed by town bylaws. *Kostenblatt*, 161 Vt. at 300, 640 A.2d at 44 ("It is an unnecessary and unreasonable burden to impose on zoning boards the duty to state all potentially applicable zoning requirements on every permit."). The permit conditions in *Kostenblatt* did not expressly limit the number of shooters for the landowner's firing range, but the board found that the landowner was operating the shooting facility in violation of town bylaws by conducting it as a profit-making venture. In contrast, the violation of the particular zoning regulation at issue here — the 100' lakefront setback — was preexisting and nonconforming with respect to the 1995 bylaws when they were adopted, and the June 6, 2006 zoning permit was a continuation of the preexisting nonconforming use, as the Environmental Court concluded. These facts distinguish *Kostenblatt*.

¶ 22. Moreover, in its decision here, the Environmental Court emphasized that two of the Town's zoning administrators involved in the case themselves believed — and conveyed their belief to

landowner's representatives — that landowner's structure "could be moved to the east or extended to the north or south without increasing its degree of nonconformity." The court also found that the zoning administrators gave landowner "the impression that overhanging decks or upper floor balconies did not count as extensions if they were not supported by posts." Thus, unlike the situation in *Kostenblatt*, the alleged bylaw violation in this case concerned precisely what was allowed by the ambiguous permit.

¶ 23. We find unpersuasive the Town's argument that landowner violated the permit by enlarging the noncomplying structure's footprint from 21' by 21' to 24' by 35', by building a three-story house, and by putting in new plumbing and sewage. The second and third alleged violations are essentially makeweight arguments. They are unrelated to the violation alleged in the NOV and disputed before the Environmental Court. Regarding the second alleged violation, the court found that there was no change — both the original and replacement structures were one-and-one-half stories on the easterly side and two-and-one-half stories on the westerly side. The third alleged violation is not mentioned in the NOV.

¶ 24. This leaves the Town with its claim that the new structure's 24' by 35' dimensions are not "over" the 21' by 21' "footprint" of the original building, as required by the 2006 permit. The problem with this alleged violation is that it runs up against the Environmental Court's findings and conclusions, detailed above, that the permit terms "over" and "footprint" are ambiguous and must be construed in favor of landowner, and that therefore the new structure remains a preexisting nonconforming building under the ambiguous 2006 permit mistakenly approved by the zoning administrator rather than sent to the zoning board of adjustment. In short, the Environmental Court effectively found that the new structure — the foundation of which was within inches of the 21' by 21' footprint of the old structure — satisfied the ambiguous terms of the 2006 permit, including the requirement that it be built over the footprint of the original structure.

¶ 25. In an effort to avoid the ramifications of the Environmental Court's findings and conclusions concerning the ambiguity of the 2006 permit, the Town argues that the permit terms are not ambiguous, and that, even if they are, landowner did not claim that they were, and the court's finding of ambiguity is mere surplusage unrelated to its ultimate legal determination. We find each of these arguments unavailing.

¶ 26. The court found the permit terms "over" and "footprint" to be ambiguous absent definitions of the terms in the zoning ordinance. We see no reason to question this determination. See *Bransford v. Zoning Bd. of Appeals of Edgartown*, 832 N.E.2d 639, 641 n.3 (Mass. 2005) (noting that word "footprint" is "subject to various definitions" but is used in this case "to describe the amount of land occupied by the house"); cf. *Simko v. Ervin*, 661 A.2d 1018, 1023 (Conn. 1995) (accepting agency's determination that attached porches should not be included in determining whether new structure remained within "footprint" of original structure). We do not find much relevance, as the Town does, in the Environmental Court's footnote stating that even if it "were to take judicial notice of the common use of the term 'footprint' in the zoning context to refer to the projection of the building onto the ground surface," it would still find the words ambiguous because of the circumstances of the case and the fact that the term was undefined. The quoted comment does not suggest that the court was providing what it believed to be the common definition of the word "footprint." Rather, the comment merely indicates that even if the court accepted the common meaning of the term suggested by the Town, it would still consider the term to be ambiguous in the context presented. The court's footnote does not aid the Town's cause.

¶ 27. The Town further argues that one of the members of Clyde's Place testified as to her understanding that the term "footprint" meant the measurement of the building rather than just its foundation, and that the court erred by considering the oral representations of the applicant and zoning administrators in determining that the term was ambiguous. The single comment cited by the Town does not demonstrate that landowner knew what town officials were demanding with respect to adhering to the permit's "footprint" requirement. Indeed, the uncertainty and confusion over that term led to several conversations between the members of Clyde's Place and the Town's zoning administrators. Overall, the record reveals that there was no consensus as to what was meant by requiring landowner to build "over" the "footprint" of the preexisting structure.

¶ 28. The Town's other arguments warrant little response. The court's findings and conclusions regarding the ambiguity of the critical terms of the permit went to the very heart of the parties' dispute; they were not surplusage having little bearing on the

legal determination of the court, as the Town claims. Although the court did not recognize the determinative outcome of those findings and conclusions, it certainly recognized their relevance, even if only for consideration later in the enforcement action.

¶ 29. Finally, we find no merit in the Town's argument that landowner failed to preserve any claim that the permit terms were ambiguous. As revealed by the record, landowner argued at trial that the 2006 permit allowed the new structure and that, at best from the Town's perspective, the permit terms were ambiguous regarding what was allowed. In any event, the "purpose of the preservation rule is to ensure that the original forum is given an opportunity to rule on an issue prior to our review." *In re White*, 172 Vt. 335, 343, 779 A.2d 1264, 1270-71 (2001). In this case, the Environmental Court plainly had such an opportunity and in fact found the critical permit terms to be ambiguous.

¶ 30. In light of the court's conclusion, which is supported by the record, that the permit terms were ambiguous and had to be construed in favor of landowner — thereby maintaining the preexisting nonconforming status of the new structure — the court was bound to enter judgment in favor of landowner. Accordingly, we need not consider the other issues in the case concerning the Town's denial of landowner's later request for a permit or variance for the new structure.

*Reversed and remanded for entry of judgment in favor of Clyde's Place LLC.*