STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 42-3-11 Vtec |

| | |
|---|---|
| Saxon Hill Corp. Sand Extraction<br>Application | **DECISION ON MOTION** |

Saxon Hill Corporation ("Applicant") seeks to establish a sand extraction operation on approximately 54 acres of land in the Town of Essex, Vermont ("the Town").[1]  Applicant applied for a permit with the Town of Essex Planning Commission ("the Commission") as required by the applicable provisions of the Town of Essex Zoning Regulations ("Regulations").   The Commission denied the application in a written decision dated February 24, 2011.  Applicant timely appealed the denial of its application.  On October 27, 2011 Applicant filed the pending motion for summary judgment.   The parties agreed to extend the deadline for the Town's response to that motion while Applicant and the Town engaged in mediation and other efforts to resolve the matter outside of this court proceeding.  Due to the nature of the issues and the complicated processes required for a mutually agreeable resolution, the parties filed a stipulated motion to place this appeal on inactive status while they attempted to resolve the matter.  The Court granted that motion on October 2, 2012.  Now, those efforts at resolution having been unsuccessful, the Town has responded to the motion for summary judgment and Applicant has replied to that response.  Based upon the parties' representations, we now return this appeal to active status and render the following determinations on the pending summary judgment motion.

**Factual Background**

For the sole purpose of putting the pending motion into context, the Court recites the following facts which it understands to be undisputed unless otherwise noted:

---

[1]  The parties have not yet provided details concerning the proposed sand extraction operation, including its relation to an already-existing extraction operation located on Applicant's property.  Given that the legal issue presented for our review concerns Applicant's challenge to the constitutionality of the applicable ordinance provisions, we do not need a detailed explanation of the proposed development at this time.

1

1.	In 1977 the Town of Essex, Vermont established a unique zoning district, the Resource Preservation District–Industrial ("RPD-I"), to govern development on an approximately 750 acre parcel including an area known as Saxon Hill.  The area contains many natural resources and the RPD-I was established with the stated objective to ensure protection of those resources through conservation and recreation uses while allowing a portion of the 750± acres to be developed for industrial purposes.

2.	In 1978, Forestdale Heights, Inc. acquired the 750± acre parcel from the Village of Essex Junction.

3.	As a required by a condition of the Village's conveyance, Forestdale Heights conveyed approximately 90 acres to the Essex Junction School District.

4.	Forestdale Heights, Inc. subsequently conveyed its land to Saxon Hill Corporation.

5.	Hector LeClaire is the president of Saxon Hill Corporation and was a principal shareholder of Forestdale Heights, Inc.

6.	The 1977 Regulations for the RPD-I allowed 25% of the parcel be used for industrial purposes, 60% to be used only for conservation/recreation uses, and the remaining 15% to be used as conservation/recreation with the contemplation that this 15% could be put towards industrial uses in the future.  All decisions regarding land use applications in the RPD-I are to be made by the Town of Essex Planning Commission.

7.	In 1978, the Planning Commission approved a conceptual map indicating the areas of land that could be used for industrial purposes and those areas that were to be used only for conservation/recreation.

8.	The Planning Commission updated this conceptual map on November 8, 2001 after multiple hearings in which Forestdale Heights, Inc. participated.  This new map, entitled the "Forestdale Technology Park Official 60/25/15 (60/40) Map," designated the additional 15% described in the 1977 Regulations for industrial use, resulting in 60% being designated for recreation/conservation uses and 40% designated for industrial uses.

9.	The specific facts of Applicant's proposed development are not before us.  The Town points out in its response to Applicant's statement of facts that the proposed sand extraction operation is entirely within the area currently designated as being for recreation/conservation use only.  It is that proposed location, and Applicant's constitutional challenge, that present the legal issues before us in this appeal.

**Discussion**

In the present motion for partial summary judgment, Applicant asks the Court to hold that the regulatory provisions of the Town of Essex Zoning Regulations related to the Resource Preservation Industrial District are unconstitutionally vague and should therefore be declared void by this Court. While a ruling on the application before us requires further facts, the question of whether the Regulations that apply to the application are constitutional is a legal question appropriate for summary judgment and ripe for our review.

## I. Summary Judgment Standard

A moving party is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a); V.R.E.C.P. 5(a)(2). We must "accept as true the [factual] allegations made in opposition to the motion for summary judgment" and give the non-moving party (here, the Town) the benefit of all reasonable doubts and inferences. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356 (internal citations omitted); V.R.C.P. 56(c) (laying out summary judgment procedures). Both the party claiming that a material fact is undisputed and the party seeking to establish a dispute of material fact must support their assertions with citations to materials in the record. V.R.C.P. 56(c)(1).

## II. Standard of Review

When reviewing a municipal land use decision, we begin with the presumption that a zoning regulation is constitutional. In re Highlands Development Co., LLC, No. 194-10-03 Vtec, slip op. at 13 (Vt. Envtl. Ct. Feb. 2, 2010) (Wright, J.) (citing Hunter v. State, 2004 VT 108, ¶ 31, 177 Vt. 339). A zoning regulation may, however, be held to be unconstitutionally vague if it fails to set forth any "guiding standards" to limit the discretion of the municipal panel. Town of Westford v. Kilburn, 131 Vt. 120, 125 (1973). While it is necessary that the municipal panel exercise some discretion, a balance must be struck between flexibility and a landowner's right to know what standards govern her application. See id. ("On one hand the standards governing the delegation of such authority should be general enough to avoid inflexible results, yet on the other hand they should not leave the door open to unbridled discrimination."). In considering whether a regulatory provision has sufficient guiding standards, we "look to the entire ordinance, not just the challenged subsection, to determine the standard to be applied." In re Pierce Subdivision Application, 2008 VT 100, ¶ 20, 184 Vt. 365. To be constitutional, a

regulation must allow the decision maker to perform two functions in reviewing applications: "First, the regulatory provision must be specific enough to allow the decisionmaker clearly to identify the resources or features to be protected," and "[s]econd, the regulation must also provide standards by which the decisionmaker can discern the degree or level of protection that must be achieved for each identified resource or feature." Highlands Development Co., LLC, No. 194-10-03 Vtec, slip op. at 15.

We interpret a zoning ordinance using the familiar rules of statutory construction. In re Appeal of Trahan, 2008 VT 90, ¶ 19, 184 Vt. 262. We will "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." Id. Where the plain meaning of the ordinance is clear, it must be enforced and no further interpretation is necessary. Vermont Alliance of Nonprofit Orgs. v. City of Burlington, 2004 VT 57, ¶ 6, 177 Vt. 47 (citing Hill v. Conway, 143 Vt. 91, 93 (1983)). In construing statutory or ordinance language, our "paramount goal" is to implement the intent of its drafters. Colwell v. Allstate Ins. Co., 2003 VT 5, ¶ 7, 175 Vt. 61. We will therefore "adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578 (quotations omitted).

III.     **Resource Preservation – Industrial District (RPD-I) Regulations**[2]

As noted above, the Regulations at issue were adopted to deal with a single large parcel of land. Regulations Table 2.14[3] governs all applications for development within the Resource Preservation – Industrial District. Because we are directed to consider the entire ordinance, we must look at the Regulations applicable to the RPD-I as a whole.

The stated intent of the RPD-I is twofold. The first is "[t]o ensure the purposes of this district are carried out." The second stated intent is "[t]o provide flexibility, at the discretion of the Planning Commission, for accommodating special or unique projects deemed to benefit the Town that might not typically be permitted or conditionally permitted under other sections of these Regulations administered by the Zoning Administrator or the Board of Adjustment." Section (A) of Table 2.14 defines the purpose of the district. It states:

---

[2] The original name of the zoning district was "Resource Preservation District – Industrial" and was given the acronym RPD-I. The current Regulations title the district "Resource Preservation – Industrial District" but maintain the acronym (RPD-I).

[3] Although titled "Table 2.14" this portion of the Regulations are presented as a list of sections and subsections and not as an actual table.

> The PRD-I District is established for land that is comprised of forests, bodies of water, high elevations, scenic overlooks, or similar natural settings. The RPD-I District acreage in combination with the 90-acre parcel zoned O1 (presently owned by the Essex Junction School District) totals 751.7 acres. The objective of the RPD-I and the related O1 District parcel is to protect all or part of such natural attributes for public enjoyment, and, when deemed economically and aesthetically feasible, to carry out development activities in harmony with the natural surroundings. Of the 751.7 acres in this district, 60% has been formally designated for recreation/conservation use (including all of the related O1 District acreage) and the remaining 40% for industrial and office uses that satisfy all other district requirements. Residential uses are not allowed in this district.

Thus, this purpose statement evidences part of the stated intent for the RPD-I.

Section (B) of Table 2.14 discusses the authority of the Planning Commission in reviewing applications for development within the RPD-I. It states: "The Planning Commission is hereby given the authority to approve original development and alterations, amendments, additions to, and variations from the original conceptual plan, approved on May 11, 1978, and as updated on the Forestdale Technology Park Official 60/25/15 (60/40) Map, approved November 8, 2001." Subsection (B)(1) notes that "all proposals for subdivision and development in the RPD-I District shall be reviewed only under the provisions for this District. Applicant's may not rely upon, nor seek remedy under any other provisions of these Regulations, except as may be provided by state law." Subsection (B)(2) states that "[s]ite plan approval by the Planning Commission, in accordance with Section 5.6 of these Regulations, shall be required prior to the development of individual parcels or sites within the RPD-I District, incorporating the intent of this district. The Planning Commission may refuse development or modification as proposed if it determines that the intent of this district has not been met." Regulations Table 2.14(B)(2) (emphasis added). Thus, conformance with the purpose stated in section (A) of Table 2.14 is a requirement for Planning Commission approval of a development application within the RPD-I.

Section (C) of Table 2.14 governs "Allowed Uses" in the RPD-I. It states that the discretionary authority granted in Section (B) "is continued for all uses not listed as permitted uses." It goes on to clarify:

> This means that the Planning Commission, in conjunction with site plan review, may allow a special or unique project or use deemed to benefit the town that might not typically be permitted under other sections of these Regulations in accordance with the following:

(1) **Permitted Uses**. Permitted uses in this district include professional offices, light manufacturing, financial institutions, educational facilities, recreation/ conservation uses, and accessory uses.

(2) **Mixed Production & Sales Areas**. In any manufacturing use allowed in this district, an area inside the structure not exceeding one thousand square feet (1,000 SF) may be set aside for the purpose of retail sales of the products manufactured by the resident company, provided that all relevant dimensional requirements for the district are met and that all parking requirements specified in Section 3.9 of these Regulations are met.

(3) **Commercial Support Services**. To stimulate industrial development, the Planning Commission may permit limited commercial support services that are operated primarily for employees of the RPD-I District such as, but not limited to, banks, restaurants, small-scale offices, recreation/health spas, etc. The specific area identified as being suitable for such uses is the approximately 12-acre parcel on the southwest corner of Thompson Drive. Such development shall be subject to all applicable district requirements.

(4) **Office Facilities**. Office buildings which exceed four thousand square feet (4,000 SF) including, but not limited to, corporate offices, research and development facilities, laboratories, industrial support offices, etc., may be permitted by the Planning Commission within the industrial portion of the RPD-I District subject to all district requirements.

Regulations Table 2.14(C) (emphasis added).

Finally, Section (D) of Table 2.14 lays out the "District Development Standards."

Subsection (D)(1) states:

Development plans for the RPD-I District have been submitted for the RPD-I in its entirety (751.7 acres) and all land features therein. At least sixty percent (60%) of land shown on the Official Forestdale Technology Park 60/25/15 (60/40) Map (effective November 8, 2001) shall be retained for recreation/conservation use, including the related O1 acreage presently owned by the Essex Junction School District. Industrial and office uses which satisfy all other requirements of this Section shall be permitted in the remaining forty percent (40%) of the land shown on this map.

(a) In association with site plan review, the Planning Commission may entertain and approve modification to district development plans as necessary to attract individual industrial users but in doing so shall not alter or modify the district allocation of recreation and conservation land.

Subsections (2)–(4) relate to height of structures, lot coverage, and buffers, which undisputedly contain specific standards not relevant to the present appeal.

## IV.     Whether the RPD-I Regulations Contain Enforceable Standards

Applicant argues that "[t]his zoning scheme with a complete lack of standards gives the Planning Commission complete, unfettered and standardless discretion to either approve or

6

deny development however they see fit." (Applicants Mot. for Partial Summ. J. at 4, filed Oct. 27, 2011). In doing so Applicant argues three points. First, Applicant argues that the intent and purpose provisions of the RPD-I do not provide sufficient standards and are therefore unenforceable. Second, it argues that the Planning Commission has discretion to approve <u>any</u> use within the RPD-I (except residential uses) and there are no standards guiding a decision as to what use can be permitted. Finally, it argues that the Town Plan provisions at issue, made applicable as part of site plan review, are unenforceable. While Applicant focuses on several of the RPD-I's many sentences, we must consider the Regulations as a whole. <u>In re Pierce Subdivision Application</u>, 2008 VT 100, ¶ 20, 184 Vt. 365.

A.    The Official Forestdale Technology Park 60/25/15 (60/40) Map

In response to the three arguments put forward by Applicant, the Town argues that this Court need not determine the constitutionality of the Regulations challenged by Applicant because the proposed development is located within the 60% of the RPD-I formally designated as only for conservation and recreation uses on the Official Forestdale Technology Park 60/25/15 (60/40) Map (effective November 8, 2001). Without amending the map, this is undisputedly a sufficient standard on which the application could be denied and therefore, the Town argues, the Court should avoid the constitutional challenges. Applicant argues that because the Planning Commission has authority to alter, amend, or modify the 60/40 map, and that authority is not limited by any standards, the portion of the RPD-I which Applicant seeks to develop may be considered part of the 40% in which industrial development is permitted.

Here, the undisputed facts are insufficient for the Court to determine what portion of the RPD-I is limited to conservation/recreation uses and whether Applicant seeks to develop within that area. The Regulations themselves appear to indicate that development has already occurred on 40% of the RPD-I. It also appears from the facts before us that Applicant participated in the process of amending the map and that process led to a formal decision of the Planning Commission. Thus, it is not entirely clear to what extent Applicant can now challenge that revised designation or whether a further map amendment is possible in compliance with the Regulations. Assuming, however, that the Planning Commission could amend the map to designate the area Applicant seeks to develop as part of the 40% portion of the District designated for industrial development, we consider whether the Regulations governing applications for development in that area are constitutional.

B.    The Intent and Purpose Statements in the RPD-I

We first consider whether the Regulations are "specific enough to allow the decision maker clearly to identify the resources or features to be protected . . . ." Highlands Development Co., LLC, No. 194-10-03 Vtec, slip op. at 15. The purpose section clearly identifies the features and resources in the RPD-I that the Regulations seek to protect. The RPD-I seeks to protect the forests, bodies of water, and other natural resources that exist on this unique parcel of land while allowing for industrial and related development on not more than 40% of the entire parcel. Regulations Table 2.14(A). This section also notes that "[o]f the 751.7 acres in this district, 60% has been formally designated for recreation/conservation use . . . and the remaining 40% for industrial and office uses that satisfy all other district requirements." Id. This formal designation is on the duly adopted Forestdale Technology Park Official 60/25/15 (60/40) Map. This map provides even more clarity as to what resources are to be protected and where. The RPD-I is therefore specific enough for both the applicant and the decision maker to identify the resources and features to be protected.

Second, we consider whether the RPD-I Regulations "provide standards by which the decision maker can discern the degree or level of protection that must be achieved for each identified resource or feature." Highlands Development Co., LLC, No. 194-10-03 Vtec, slip op. at 15. Regarding Applicant's first argument, we conclude that the intent and purpose provisions of the RPD-I contain sufficient standards for the Planning Commission to determine the degree or level of protection.

Within the 60% of the RPD-I formally designated for conservation/recreation uses, and the location of that area designated on the map, the level of protection is clear: the resources in that area are fully protected and no development is allowed. Instead, only conservation and recreation uses are allowed. There are also discernible standards within the remaining 40% of the RPD-I. Table 2.14 section (A) states that the purpose of the district is "is to protect all or part of such natural attributes for public enjoyment, and, when deemed economically and aesthetically feasible, to carry out development activities in harmony with the natural surroundings." Table 2.14(B)(2) makes this purpose a standard governing applications for development within the RPD-I.

Applicant argues that "[n]o one—not the landowner, not the Planning Commission, and not the Court—can possibly know [what this standard means] because Table 2.14 does not

8

say." (Applicant's Mot. for Partial Summ. J. at 9, filed Oct. 27, 2011). Despite the fact that the Regulations do not define "economic or aesthetic feasibility" or "harmony with the natural surroundings," the Planning Commission and this Court can apply these standards using the plain and ordinary meaning of the words chosen by the drafters.

Within the context of interpreting a town plan provision under Act 250 Criterion 10 (which requires a showing of conformance with any duly adopted town or regional plan), the Vermont Supreme Court held that the Royalton Town Plan requirement that commercial development be located within or close to the two village centers "where feasible" was too ambiguous to be enforced through Criterion 10. In re Times & Seasons, LLC, 2008 VT 7, ¶¶ 21– 23, 183 Vt. 336. The Supreme Court stated "[e]ven if we give the words 'where feasible' their plain and ordinary meaning, it remains unclear." Id. at ¶ 23. The Time and Seasons Court noted that it was left to wonder "if the drafters . . . intended this phrase to refer to economic feasibility, physical feasibility, some combination of both, or perhaps some other measure of feasibility altogether." Id.

Here, the RPD-I Regulations state that development may only be approved where economically and aesthetically feasible. Within the scope of economic and aesthetic feasibility, we look to a commonly relied-upon definition for "feasible": "[c]apable of being done, executed, affected or accomplished. Reasonable assurance of success." Black's Law Dictionary 549 (5th ed. 1979).[4] Thus, a development will be aesthetically feasible if it will have a reasonable assurance of aesthetic compliance. In other words, a proposed development is not aesthetically feasible if it will have an unreasonable adverse effect on the aesthetics of the area. With the guidance provided by Act 250 case law, which notes that a determination of whether a proposed project will have an adverse aesthetic impact is followed by a determination of whether that impact would be undue, we conclude that this term ("aesthetic feasibility") provides a sufficient guiding standard. See Times & Seasons, 2011 VT 7, ¶ 8 (citations omitted) (noting that in determining whether a project complies with Act 250 Criterion 8 one first "determines if the proposed project will have an adverse aesthetic impact" and second "whether that the adverse impact would be undue"). An adverse aesthetic impact will be undue if "the applicant [has] failed to take generally available mitigating steps that a reasonable

---

[4] The most recent edition of Black's Law Dictionary does not define "feasible" but does define "feasibility standard" as: "The requirement that, to obtain bankruptcy-court approval, a Chapter 11 reorganization plan must be workable and have a reasonable likelihood of success." (9th ed. 2009) (emphasis added).

person would take to improve the harmony of the proposed projects with its surroundings." Id. Thus, the RPD-I requirements that proposed development be "economically and aesthetically feasible" and "in harmony with its surroundings" provide standards such that the Planning Commission is not given complete and unbridled discretion it could exercise in a discriminatory way.

C.      Uses Allowed in the RPD-I

Regarding Applicant's second argument, that there are no standards governing what uses may be allowed in the RPD-I, we conclude that the plain language of the Regulations <u>do</u> set standards for determining what uses are allowed.

Within the 60% portion of the district formally designated as recreation/conservation, only those two use categories are allowed. The Regulations directly state that "[d]evelopment plans for the RPD-I District have been submitted for the RPD-I in its entirety (751.7 acres) and all land features therein. At least sixty percent (60%) of land shown on the Official Forestdale Technology Park 60/25/15 (60/40) Map (effective November 8, 2001) <u>shall be retained for recreation/conservation use</u> . . . ." Regulations Table 2.14(D)(1) (emphasis added). While it notes that "the Planning Commission may entertain and approve modifications to district development plans as necessary to attract individual industrial users" it states that in doing so the Planning Commission "<u>shall not alter or modify the district allocation of recreation and conservation land</u>." Id. (emphasis added). The level of protection for the area designated as recreation/conservation land is therefore clear: recreation and conservation uses are permitted as of right, all other uses are prohibited.

Within the 40% designated as for industrial uses, it is clear that the drafters of the Regulations intended to give the Planning Commission a measure of discretion in allowing various types of development. Like the designation for recreation/conservation, there is not a complete lack of standards such that the Planning Commission has unfettered discretion. Section (C) of Table 2.14 sets out standards for what uses are allowed within the RPD-I. By its plain language, it does not, as Applicant argues, allow for the Planning Commission to approve <u>any use</u>. In so arguing, Applicant points to the "Summary Use Chart" at Table 2.1 of the Regulations. This chart lays out what uses are permitted in other districts, but for the RPD-I, a footnote explains that the reader must See "RPD-I District for Further Use Provisions." Regulations Table 2.1. Furthermore, the RPD-I Regulations explicitly state that "all proposals

10

for subdivision and development in the RPD-I District shall be reviewed <u>only under the provisions for this District</u>.  Applicant's <u>may not rely upon</u>, nor seek remedy under <u>any other provisions of these Regulations</u>, except as may be provided by state law."  Regulations Table 2.14(B)(1)(emphasis added).  Thus, under the plain language of the Regulations, only those uses described in Table 2.14(C) are permitted within the 40% of the RPD-I designated for industrial development.

Table 2.14(C)(1) states that for the entire RPD-I, permitted uses within the designated areas are professional offices, light manufacturing, financial institutions, educational facilities, recreation/conservation uses, and accessory uses.  Retail sales are also permitted within a 1,000 square foot portion of a manufacturing use, thereby allowing for the sale of the products manufactured on site, provided dimensional and parking requirements are met.  <u>Id</u>.  Commercial support services such as, but not limited to, banks, restaurants, small-scale offices, recreation/health spas, etc. are conditionally permitted within a designated 12-acre subsection of the district.  Also conditionally permitted are office buildings exceeding 4,000 square feet.  While Applicant focuses on the broad language allowing the Planning Commission to allow "a special or unique project or use deemed to benefit the town that might not typically be permitted under other sections of these Regulations," it is clear that the Planning Commission may only do so "in accordance with" the specific provisions in Table 2.14(C)(1)–(4).  Thus, we conclude that the use provisions provide sufficient standards to guide the Planning Commission and are therefore not unconstitutionally vague.

D.    <u>Conformance with the Essex Town Plan</u>

Finally, we address Applicant's constitutional challenge to the applicable provisions of the Town of Essex Town Plan ("Town Plan").  Table 2.14(B)(2) requires that any proposed development seeking approval within the District also secure site plan approval under Regulations § 5.6.  Within that subsection, the Regulations provide "General Requirements," including a requirement that the proposed development "[c]onform[] with the duly adopted Essex Town Plan."  Regulations § 5.6(A)(1).  Applicant asserts that this requirement also fails to pass constitutional muster for lack of sufficient standards.

Section 7.4 of the Town Plan discusses "Natural Areas in Essex" and has a section specifically related to Saxon Hill Forest.  First, this section describes some of the important natural resources located within the Saxon Hill Forest, including "four reservoir areas, 12 miles

of cross-country ski trails, numerous species of wild flowers and a proliferation of red, scotch and white pine trees." It then recognizes that apart from the 90 acres now owned by the Essex Junction School District, the Saxon Hill Forest was predominantly owned by Applicants predecessor in interest, Forestdale Heights, Inc. The Plan then states:

> Protection of the trees is perhaps the primary means of preserving the amenities which the Forest offers. The trees enhance the recreational value of the trails and significantly contribute to the aesthetics of the area. Proper forest management techniques need to include harvesting for long-term forest growth. For these reasons, development within the forest should continue to consist of broad belts of trees and large contiguous blocks of forest. In addition, air pollutants for certain industrial processes which might be harmful to tree species should be restricted or prohibited.

Town Plan at 7–8. Applicant argues that this section does not provide sufficient standards and therefore cannot be applied through the Regulations.

While similar, the legal standard for conformance with a town or municipal plan is different from the standards governing whether the more specific implementations of those plans, the applicable zoning regulations, pass constitutional muster. As the former Environmental Board has noted "[m]ost town plans and regional plans are not written like zoning bylaws. They frequently do not contain words such as 'prohibited' or phrases such as 'shall not be allowed.' But this does not mean that they are legally meaningless." Re: Mclean Enters. Corp., No 2S1147-1-EB, at 80 (Vt. Envtl. Bd. Nov. 24, 2004) (citations omitted); see also In re Union Bank Jeffersonville, No. 7-1-12 Vtec, slip op. at 4–5 (Vt. Super. Ct. Envtl. Div. Oct. 30, 2013) (Durkin, J.) (discussing legal standard for Act 250 Criterion 10). Municipalities may include conformance with a town or regional plan as a requirement for site plan or conditional use approval. See e.g., In re Group Five Invs. CU Permit, 2014 VT 19, ¶ 16, available at http://info.libraries.vermont.gov/supct/current/op2013-009.html (considering conformance with town plan in municipal permit appeal). When this is the case, only those plan provisions that set forth a "specific policy" and are "stated in language that is clear and unqualified, and creates no ambiguity" will be regarded as regulatory instead of aspirational and can therefore be enforceable against an applicant. See In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520 (citations omitted) (internal quotation marks omitted) ("Broad policy statements phrased as nonregulatory abstractions . . . may not be given the legal force of zoning laws . . . .").

We conclude that the requirements that "[p]roper forest management techniques need to include harvesting for long-term forest growth" and "development within the forest should

continue to consist of broad belts of trees and large contiguous blocks of forest" are not broad policy statements or regulatory abstractions, but specific and concrete policies. As such, depending on the facts of the case, they may be enforceable against an individual applicant seeking approval for a specific project.

## Conclusion

While the Vermont Supreme Court has held that a zoning regulation must be deemed unconstitutional when it is determined to be so vague and standardless as to infringe upon an applicant's due process rights, it has also recognized that there must be flexibility for an appropriately established municipal panel to deal with changes in development patterns and cumulative impacts of development over time. Town of Westford v. Kilburn, 131 Vt. 120, 125 (1973). Only when the regulatory scheme, considered in its entirety, provides limitless discretion and opens the door to arbitrary and discriminatory decisions will the presumption of constitutionality be overcome and the offending regulations struck down. Because the Town of Essex Zoning Regulations at issue in this case provide sufficient standards to guide the Planning Commission, or this Court on appeal, and because Applicant has been on notice of what specific development can and cannot be undertaken in the RPD-I Zoning District, we conclude that Applicant's motion for partial summary judgment is **DENIED**.

Electronically signed on September 17, 2014 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division

13