STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| | Docket No. 76-7-18 Vtec |

| | |
| --- | --- |
| Champlain Parkway SW Discharge Permit | DECISION ON MOTIONS |

The City of Burlington ("City") seeks to renew its stormwater discharge permit for the Champlain Parkway highway project ("Project") in Burlington, Vermont. Fortieth Burlington, LLC ("Fortieth"), a nearby property owner, appeals the Vermont Agency of Natural Resources' ("ANR") decision to issue the City a renewed permit. The Court here considers the City's and ANR's motions for partial summary judgment. The motions relate to two discrete issues raised by Fortieth in its Statement of Questions. First, the City and ANR move on the issue of whether the City's application for renewal must be denied as untimely. The City alone moves on the second issue, asserting that it has the option of choosing whether the regulatory standards of the 2002 or the 2017 Vermont Stormwater Management Manual ("2002 VSMM" and "2017 VSMM," respectively) apply to the Project. Fortieth opposes the motions on both issues.

Judith L. Dillon, Esq., represents Fortieth in this matter. Hannah W. Smith, Esq., and Randy J. Miller II, Esq., represent ANR. Jonathan T. Rose, Esq., and Brian S. Dunkiel, Esq., appear on behalf of the City.

**Legal Standard**

This Court grants a motion for summary judgment when there is no genuine dispute over the material facts and the moving party is entitled to judgment as a matter of law. V.R.C.P. 56(a). The Court takes all of the nonmoving party's factual allegations as true if they are supported by affidavits or other evidentiary material. V.R.C.P. 56(c); White v. Quechee Lakes Landowners' Ass'n, Inc., 170 Vt. 25, 28 (1999) (citation omitted). Further, we draw all reasonable inferences and resolve all reasonable doubts in favor of the nonmovant. DeBartolo v. Underwriters at Lloyd's of London, 2007 VT 31, ¶ 8, 181 Vt. 609 (citation omitted). However, nonmovants must make a specific and supported showing that a fact is genuinely disputed; bare allegations of a

dispute do not foreclose the possibility of summary judgment. See In re Morrill House, LLC, 2011 VT 117, ¶ 7, 190 Vt. 652; see also Webb v. Leclair, 2007 VT 65, ¶ 14, 182 Vt. 559 (citing Morais v. Yee, 162 Vt. 366, 372 (1994)).

## Factual Background

The following facts inform the Court's present decision on summary judgment. They are not factual findings, which must be established by trial. See Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (citing Booska v. Hubbard Ins. Agency, Inc., 160 Vt. 305, 309 (1993)).

1.      The Champlain Parkway is a proposed public transportation project designed to connect I-189 and U.S. Route 7 to Lakeside Avenue, and to then follow Lakeside Avenue and Pine Street to Main Street, with the highway terminating in downtown Burlington, Vermont.

2.      Fortieth owns property along Lakeside Avenue.

3.      The Project involves the construction of new road, a shared-use path, and a variety of other traffic- and pedestrian-related features.

4.      The Project is a joint effort between the City and the Vermont Agency of Transportation ("VTrans"). The Federal Highway Administration is contributing to the funding.

*The Timeliness of the City's Renewal Application*

5.      The City originally obtained a stormwater permit for the Project from ANR in 2004.

6.      After a renewal of the original permit in 2010, ANR approved the City's application to amend the permit on October 11, 2012 ("2012 Permit").

7.      By its terms, the 2012 Permit lasted for five years, until October 11, 2017. This is the permit the City seeks to renew here.

8.      The 2012 Permit and ANR's Stormwater Management Rule for Stormwater-Impaired Waters ("Stormwater Management Rule") contained a provision stating that applicants for renewal "shall" file their applications at least 90 days prior to the expiration of the permit. See Stormwater Management Rule § 22-309(k)(1).

9.      The City submitted its application for renewal on September 15, 2017, about one month before the 2012 Permit was set to expire.

10.     Through the years, ANR has consistently accepted renewal applications filed after the 90-day term has passed.

11.     ANR's practice is to accept applications as timely as long as they are submitted before the expiration of the active permit.

12.     Jenna Olson, who supplied an affidavit bearing on this issue, submitted the City's renewal application in her role as the Stormwater Program Manager for the City of Burlington. She has held this position since November 2016. Prior thereto, she worked as an Environmental Analyst and Stormwater District Manager in ANR's Stormwater Program. In this capacity, she processed hundreds of renewal applications for ANR. Ms. Olson does not recall a single instance where the 90-day provision resulted in denial or dismissal of an application.

13.     Padraic Monks, who has served as the Program Manager of ANR's Stormwater Program since 2007, corroborated Ms. Olson's statements in his May 3, 2019 affidavit.

14.     ANR revised the Stormwater Management Rule through the formal rule-making process in 2019. The new version of the Rule (effective February 25, 2019) does not contain the 90-day term or any specific term related to the submission of renewal applications.[1]

*The 2002 and 2017 VSMM*

15.     The 2017 VSMM provides that applicants proposing a public transportation project who "initiated right-of-way valuation activities" before January 1, 2017, to acquire land for their project can choose whether the 2002 or the 2017 VSMM applies to the project. See 2017 VSMM § 1.4.

16.     Various valuation and condemnation efforts took place in the 1980s to secure land for what was called the "Southern Connector." The current Project makes use of this land but also requires additional land acquisition.

17.     VTrans began certain valuation and acquisition activities related to the Project on March 14, 2016, and possibly before. These activities included initiating appraisals and waiver valuations.

18.     VTrans began negotiating with property owners on or before August 2, 2016.

19.     VTrans began billing for these activities in early- to mid-2016.

---

[1] Unless otherwise indicated, any reference to the Stormwater Management Rule in this Decision connotes the former Stormwater Management Rule in effect at the time the City applied for renewal in 2017—the version that still included the 90-day term.

20.    VTrans finalized its supplemental right-of-way plan on April 18, 2018.  It did so anticipating a May 21, 2018 necessity hearing on the land acquisition proposal.  (These terms are discussed in greater detail below.)

21.    Norman J. Baldwin, P.E., serves as the City of Burlington Engineer and Surveyor, as well as the Assistant Director of Public Works.  Mr. Baldwin oversees the Project for the City.

22.    Bruce Melvin is the Right-of-Way Acquisition Chief in VTrans' Right-of-Way Section.  He has held this position for almost eleven years and has worked in the Right-of-Way Section in various other capacities since 1979.  As Right-of-Way Acquisition Chief, Mr. Melvin oversees VTrans' right-of-way valuation and acquisition activities related to the Project.

*The Present Renewal Application*

23.    After receiving the City's September 15, 2017 renewal application, ANR deemed the application administratively complete on September 18, 2017.

24.    Beginning January 3, 2018, the application underwent public comment.

25.    Fortieth submitted written comments to ANR on February 2, 2018.

26.    After considering Fortieth's comments, ANR decided to issue the City the renewal permit on June 19, 2018.

27.    Fortieth appealed ANR's decision to this Court on July 18, 2018.

**Discussion**

As indicated, the City's and ANR's motions require this Court to address two issues. The first involves a requirement in the City's 2012 Permit and ANR's Stormwater Management Rule that applications for permit renewals be submitted 90 days before the expiration of the active permit.  Both the City and ANR move for judgment in their favor on this issue.  They assert that the 90-day term is a procedural rule relevant only to ANR's internal administration that ANR had consistently disregarded and has since abandoned with the new version of the Stormwater Management Rule.

The second issue, on which the City alone moves, relates to a "transition" clause in the 2017 VSMM.  The 2017 VSMM updates the standards of the 2002 VSMM.  Both versions define specific management and design standards for development activities that discharge stormwater pursuant to a permit.  The transition clause provides applicants developing public transportation

4

projects who undertook certain steps to acquire land before January 1, 2017, with the option of applying the standards of the 2002 VSMM instead of the 2017 VSMM.  See 2017 VSMM § 1.4. The City asserts that the Project satisfies the prerequisites of the transition clause, so the 2002 VSMM standards apply.

Both of these issues relate to multiple Questions in Fortieth's Statement of Questions. They also relate to certain of the clarified Questions Fortieth submitted in response to this Court's April 29, 2019 Decision, which required Fortieth to narrow its Statement of Questions.  See Champlain Parkway SW Discharge Permit, No. 76-7-18 Vtec (Vt. Super. Ct. Envtl. Div. Apr. 29, 2019) (Durkin, J.).  To avoid any confusion, we discuss the two issues separately from the relevant Questions.  We discuss the implications of our Decision for Fortieth's Statement of Questions in the Conclusions section below.

I.      **Whether the 90-day term for renewal applications precludes the City's present application**

The City's 2012 Permit provides that "[t]he permittee shall reapply for a renewed discharge permit ninety days prior to the expiration date of this permit."  This language mirrors a provision of the Stormwater Management Rule, which states that the holder of a stormwater discharge permit "who wishes to continue to discharge after the expiration date of his/her individual permit shall file an application for reissuance of the individual permit . . . at least 90 days prior to its expiration."  Stormwater Management Rule § 22-309(k)(1).

The City does not suggest that it filed its application in compliance with these terms. Instead, the City and ANR acknowledge that the City filed for renewal about a month before the City's permit was due to expire, but they assert that the 90-day requirement was a housekeeping measure relevant to ANR's internal application review process.  They offer that, as such, ANR had discretion to disregard the measure in pursuit of the orderly administration of permits and had, in fact, established a consistent practice of honoring renewal applications that did not meet the 90-day requirement.

Fortieth argues that the 90-day requirement was a clear condition of the 2012 Permit and the Stormwater Management Rule.  It asserts that ANR cannot disregard the requirement because the 90-day term benefits the public and serves as more than an internal operating

procedure. In Fortieth's view, noncompliance with the term bound ANR to reject the renewal and obligated the City to file for a new stormwater permit.

We begin with the question of the deference this Court owes to ANR. The policy justifications behind affording an agency deference include "agency expertise," the agency's "familiarity with [the] purpose of the regulation," and "the express delegation of legislative authority to promulgate regulations." Bacon v. Lascelles, 165 Vt. 214, 218-19 (1996) (citations omitted). This Court must bear in mind that we are not "'a higher environmental agency entrusted with the power to make environmental law and policy,' but rather exercise a 'narrow role in ensuring that the decisions of ANR are made in accordance with law.'" Plum Creek Me. Timberlands, LLC v. Vt. Dep't of Forests, Parks, & Recreation, 2016 VT 103, ¶ 30, 203 Vt. 197 (quoting Jones v. Dep't of Forests, Parks, & Recreation, 2004 VT 49, ¶ 14, 177 Vt. 81). This principle derives from the role of the judiciary in the separation of powers, as well as this Court's recognition of its limitations and the bounds of its own expertise. C&S Wholesale Grocers, Inc. v. Dep't of Taxes, 2016 VT 77A, ¶ 10, 203 Vt. 183 (citing In re Williston Inn Grp., 2008 VT 47, ¶ 13, 183 Vt. 621).

With regards to ANR's own regulations, the Vermont Supreme Court has acknowledged the "substantial deference" owed to "ANR's interpretation of the regulations governing the wetland and stormwater discharge permits at issue." In re Costco Stormwater Discharge Permit, 2016 VT 86, ¶ 5, 202 Vt. 564; see also In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶¶ 11, 15, 196 Vt. 467 (affording deference to ANR's interpretation of stormwater regulations).

The deference this Court owes to agencies is not absolute or guaranteed. See In re Conservation Law Found., 2018 VT 42, ¶ 15 (citing In re Wal-Mart Stores, Inc., 167 Vt. 75, 80 (1997)). Like the Vermont Supreme Court, this Court will accord a high level of deference to an agency's application of its own procedural regulation, unless the agency applies the regulation inconsistently or in a way that exceeds the agency's statutory mandate. In re Green Mountain Power Corp., 2018 VT 97, ¶ 13 (citing In re Stowe Cady Hill Solar, LLC, 2018 VT 3, ¶¶ 17, 19, 206 Vt. 430). We also consider whether the agency's decision is directed at proper regulatory

6

objectives. Conservation Law Found., 2018 VT 42, ¶ 15 (citing In re Citizens Utils. Co., 171 Vt. 447, 450 (2000)).

Before applying these standards to the present matter, we first note that the above case law is typically cited in discussions of the deference owed to an agency's expert interpretation of its substantive regulations when determining a regulated entity's compliance with those regulations. See, e.g., Plum Creek, 2016 VT 103, ¶ 30. Here, we consider a different form of expertise, not related to ANR's institutional knowledge as an agency of natural resources per se, but as an administrative agency that deals with the day-to-day particulars of superintending a permitting program.

Considering the reasons for and against deference, which we articulate below, we conclude that it is appropriate to defer to ANR's characterization of the 90-day term.

First, while the 90-day term is incontrovertibly clear in both the Stormwater Management Rule and the 2012 Permit, the consequences of noncompliance with the term are not as plain as Fortieth suggests.[2] Fortieth argues that the City's noncompliance must necessarily compromise its ability to renew, so that the City must now apply for a new stormwater permit. However, neither the 2012 Permit nor the Stormwater Management Rule provide that noncompliance with the 90-day term necessarily forecloses renewal. In fact, they do not prescribe any consequence for noncompliance, especially not the harsh consequence of returning the applicant to square one of the permitting process.

In the context of statutory time limits, the Vermont Supreme Court has repeatedly held that a specified time limit is only "jurisdictional" (i.e., noncompliance requires dismissal of the matter) when the rule specifies both a time limit and a consequence for failing to comply with that limit. See State v. Singer, 170 Vt. 346, 348-49 (2000) (citing In re Mullestein, 148 Vt. 170,

---

[2] While the 90-day term was a part of the Stormwater Management Rule and a condition of the City's 2012 Permit, we conclude that the term's applicability, and the consequences of noncompliance, should be evaluated the same way in both contexts. The fact that the term is also a permit condition does not make it more binding or consequential in this circumstance. When interpreting a permit condition, as with an agency regulation or a statute, we ultimately seek to uncover the intent of the drafters. Agency of Nat. Res. v. Weston, 2003 VT 58, ¶ 16, 175 Vt. 573 (citing Sec'y, Vt. Agency of Nat. Res. v. Handy Family Enters., 163 Vt. 476, 481 (1995)). Here, because the 2012 Permit condition is identical to the relevant provision in the Stormwater Management Rule for all practical purposes, we conclude that the intent behind the condition mirrors the intent behind the Rule provision. Thus, in deferring to ANR's position on the 90-day term in the Stormwater Management Rule, the Court is also interpreting the 2012 Permit condition in the same manner.

174 (1987)).[3]  In the absence of a clear directive concerning the consequences, we will not read in a jurisdictional limitation requiring dismissal.  See Mullestein, 148 Vt. at 174 ("Where the Legislature has intended a time limit to be mandatory, it has clearly expressed that intent.").

Given that the 90-day term is based on an agency rule and does not rise to the level of a statutory requirement, this principle carries even more weight.  Where a regulation does not indicate the consequences of noncompliance, there is necessarily ambiguity.  Deferring to the agency that produced and administers the regulation becomes even more appropriate.

This corresponds with an intersecting branch of precedent, which provides that conditions or "limitations 'that are not stated on the permit may not be imposed on the permittee.'"  In re Stowe Highlands Merger/Subdivision Application, 2013 VT 4, ¶ 12, 193 Vt. 142 (quoting In re Stowe Club Highlands, 164 Vt. 272, 276 (1995); In re Kostenblatt, 161 Vt. 292, 299 (1994)).  Where neither the 2012 Permit nor the Stormwater Management Rule dictate the strict result Fortieth urges, this Court will not independently (and retroactively) impose a condition with that effect.[4]

This also corresponds with the U.S. Supreme Court's conclusions in analogous cases.  The Supreme Court has held that where "a statute does not specify a consequence for noncompliance with its timing provisions, federal courts will not in the ordinary course impose their own coercive sanction."  Dolan v. United States, 560 U.S. 605, 611 (2010) (citing United States v. James Daniel Good Real Prop., 510 U.S. 43, 63 (1993)) (concluding that a sentencing court's failure to set a restitution hearing before the 90-day deadline did not deprive the court of the power to order restitution); see also Nielsen v. Preap, 139 S.Ct. 954, 967-68 (2019).

---

[3] Other cases considering this rule of construction include State v. Love, 2017 VT 75, ¶¶ 10-11, 205 Vt. 418; Vt. Human Rights Comm'n v. Agency of Transp., 2012 VT 88, ¶ 8, 192 Vt. 552; and, less directly, In re Green, 2006 VT 88, ¶¶ 2-3, 180 Vt. 597 (mem.).

[4] Fortieth also points out that both the 2012 Permit and the Stormwater Management Rule use the term "shall" in setting out the 90-term, which, Fortieth contends, means that noncompliance precludes renewal.  We do not follow Fortieth's chain of reasoning.  While Vermont courts have interpreted "shall" to indicate a mandatory deadline, the use of that term alone is far from dispositive, particularly in light of the harsh consequence Fortieth suggests.  See Mullestein, 148 Vt. at 174; cf. State v. Hemingway, 2014 VT 48, ¶ 11, 196 Vt. 441 (citation omitted); see also Barnhart v. Peabody Coal Co., 537 U.S. 149, 158 (2003) (citing Brock v. Pierce Cnty., 476 U.S. 253, 255 (2003)).  More importantly, as used here, the term "shall" does not instruct ANR to carry out any actions in response to noncompliance.  Both the 2012 Permit and the Rule use "shall" in reference to the permittee and do not command action on the part of ANR.

The U.S. Supreme Court has based this principle, in part, on the rationale that "the failure of Congress to specify a consequence for noncompliance with the timing requirements of [the statute] implies that Congress intended the reasonable officials administering the [statute] to have discretion to determine what disciplinary measures are appropriate . . . ." James Daniel, 510 U.S. at 64-65; see also Barnhart v. Peabody Coal Co., 537 U.S. 149, 157-58 (2003). In an earlier case in this line, the Supreme Court stated that "[w]hen, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." Brock v. Pierce Cnty., 476 U.S. 253, 260 (1986); see also Montford & Co., Inc. v. S.E.C., 793 F.3d 76, 81-82 (D.C. Cir. 2015). Similarly, in the matter at hand, ANR did not specify a consequence of noncompliance, leaving itself discretion to handle renewal applications submitted after the 90-day term as needed.[5]

Turning to other considerations relevant to agency deference, the statute that enables ANR to regulate stormwater through permitting, 10 V.S.A. § 1264, does not require applicants seeking to renew their permits to file at least 90 days before their active permit expires. The stormwater statute does not address individual permit processing deadlines at all, other than to limit them to a maximum term of five years. 10 V.S.A. § 1264(h). The 90-day term is an agency rule and permit condition propagated by ANR. Thus, ANR's interpretation and practice do not conflict with the enabling statute.

ANR's characterization of the 90-day term is also bolstered by ANR's consistent practice of accepting renewal applications filed after this deadline.[6] See Green Mountain Power, 2018 VT 97, ¶¶ 17-18 (affording an agency deference when considering its implementation of a procedural rule "[o]n the basis of [the agency's] consistent application"). Additionally, ANR has since eliminated the 90-day term in the newest version of the Stormwater Management Rule.

---

[5] We again note that the City filed its renewal application before its 2012 Permit expired. This fact likely contributed to ANR deciding, in its discretion, to not impose a sanction for a renewal application filed within this time frame.

[6] While Fortieth generally asserts that there is a dispute of material fact surrounding ANR's authority to deviate from the 90-day term, Fortieth does not specifically dispute that ANR has consistently accepted renewal applications filed less than 90 days before the active permit's expiration. Nor does Fortieth supply evidentiary material to counter the City and ANR's assertion of this consistent practice, which finds substantial support in the record. See V.R.C.P. 56(c) (requiring a party who asserts a genuine dispute of material fact to support the assertion); Clayton v. Unsworth, 2010 VT 84, ¶¶ 27-28, 188 Vt. 432 (affirming decision on summary judgment because "mere allegations," without "specific facts" and "citations to the record," did not create a dispute of material fact).

9

Though this action is certainly tardy, ANR's formal rejection of the 90-day term further reflects the consistency of its approach to renewal applications.

ANR's familiarity with the purpose of the 90-day term further encourages deference. ANR created the term, as well as the permitting program the term was designed to service. This Court recognizes that we are not a "higher environmental agency" with the knowledge necessary to identify which specific operating procedures are or are not useful in the renewal of stormwater permits. ANR itself is best situated to understand the pressures of its caseload and the time demands of permit processing.[7]

Additionally, Fortieth had a full and fair opportunity to voice its concerns with the renewal during the public comment period and has exercised its appeal rights without hindrance. In determining whether the agency's rule is merely an internal operating procedure, courts, including the Vermont Supreme Court, have considered whether "the rights of individuals are affected" by noncompliance. See In re Conway, 152 Vt. 526, 529 (1989) (quoting Morton v. Ruiz, 415 U.S. 199, 235 (1974)); see also In re UVM Certificate of Appropriateness, No. 2013-301, slip op. at 2-3 (Vt. Jan. 2014) (mem.) (dismissing the matter because the appellant raised a procedural injury but could not identify how his own interests were affected). Fortieth has also failed to demonstrate prejudice in another form, or that ANR's actions have disrupted its expectations because of its reliance on the 90-day term.[8]

---

[7] The treatment of the 90-term we adopt here aligns with the conclusions reached by the U.S. Supreme Court and other jurisdictions regarding an agency's internal operating procedures. Generally, the U.S. Supreme Court has required agencies to abide by their own rules. See United States ex rel Accardi v. Shaughnessy, 347 U.S. 260, 268 (1954). However, this principle is not without its exceptions. An agency's deviation from "its procedural rules adopted for the orderly transaction of business," also referred to as "internal administrative procedures," does not require reversal unless the complaining party shows "substantial prejudice." Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538-39 (1970); see also Leslie v. Att'y Gen. of U.S., 611 F.3d 171, 176-80 (3d Cir. 2010) (examining the relationship between Accardi and American Farm Lines). Courts applying the doctrine have perpetuated a similar prejudice standard. See, e.g., Leslie, 611 F.3d at 176-80; United States v. Eisenberg, 149 F.Supp.3d 71, 89-90 (D.D.C. 2015); cf. Padilla v. Adm'r, Fed. Aviation Admin., 662 Fed.Appx. 743, 745 n.3 (11th Cir. 2016) (implying that even considerations of prejudice are not relevant with this kind of administrative rule).

[8] In fact, the City has effectively supported its assertion that it was the party that relied on ANR's established practice of accepting renewal applications filed after the 90-day term, and that its expectations would be unsettled through a sudden and strict application of the time limit. See Stowe Cady Hill Solar, 2018 VT 3, ¶ 21 (citing Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n, 473 F.3d 1239, 1241 (D.C. Cir. 2007)) ("A fundamental norm of administrative procedure requires an agency to treat like cases alike.").

In sum, affording ANR the deference it is due, we conclude that the 90-day term is not a procedural rule that provides protections for the due process rights of the public or regulated entities; it is a housekeeping measure that ANR recognized it did not need to strictly enforce.[9]

Finally, we add that the City's ability to renew its stormwater permit does not allow it to evade review or take advantage of former regulations that might be more relaxed. Fortieth primarily bases its claims of prejudice on the premise that the City alone profits from the option to renew, so the 90-day term should be strictly construed against the City. An active stormwater permit's conditions remain in place and static, even if ANR tightens the relevant water quality standards. When a permit is renewed, however, it must then be evaluated against any changed regulatory standards. Therefore, unlike the vested rights doctrine in the context of municipal permits, which do not expire, renewal does not allow a permitted entity to discharge stormwater indefinitely under an older, more-lenient set of regulations. See In re Paynter 2-Lot Subdivision, 2010 VT 28, ¶ 9, 187 Vt. 637 (citing Smith v. Winhall Planning Comm'n, 140 Vt. 178, 181-82 (1981)) (discussing the vested rights doctrine). The option to renew spares ANR and the applicant from reviewing the same project against the same, unchanged regulations, while still allowing ANR to apply any new standards that have developed since the former permit issued.

## II.     Whether the City can choose to apply the 2002 VSMM to the Project pursuant to the "transition" clause in the 2017 VSMM

Though the 2017 VSMM became effective on July 1, 2017, its transition clause provides that an applicant for a stormwater discharge permit can choose to apply the standards in the 2002 VSMM if the project is "a public transportation project" and the applicant "has initiated right-of-way valuation activities or determined that right-of-way acquisition is not necessary" before January 1, 2017. 2017 VSMM § 1.4 (emphasis added).

---

[9] We emphasize the narrow constraints of our conclusions here. This case does not stand for the proposition that ANR can effectively rewrite any of its rules by consistently deviating from their clear terms. We here consider an internal procedural rule, which ANR established for its own benefit and the orderly administration of permits. The rule does not specify the consequences of noncompliance. Fortieth received and continues to enjoy the full complement of its due process rights. ANR adapted its review requirements when it recognized that its management of the stormwater permitting scheme could proceed without rigid enforcement of the 90-day term. It instituted a new protocol that, by all indications, has become routine and the expected norm. In accordance with that change, ANR has since revised the 90-day term out of the Stormwater Management Rule.

The parties only dispute whether the City "initiated right-of-way valuation activities" before January 1, 2017. They disagree on the specific land acquisition actions the transition clause required the City to take before the designated date.

The City offers two arguments. First, it asserts that VTrans' more recent efforts to value and acquire additional land for the Project began in early- to mid-2016, months before January 1, 2017. The City also submits that the right-of-way valuation and condemnation proceedings that occurred in the 1980s to procure land for the Southern Connector—land which the City is still proposing to use for the Project—qualify under the transition clause.

In response, Fortieth argues that VTrans' more recent efforts at acquisition were not initiated until April 18, 2018, at the earliest, when VTrans finalized its supplemental right-of-way plan in preparation for a May 2018 necessity hearing. We describe these terms below. Next, Fortieth asserts that there are disputed material facts relevant to whether the current Project and the Southern Connector qualify as the same "project" for the purpose of acquiring land pursuant to the transition clause.

We first consider whether a dispute of material fact exists regarding VTrans' 2016 acquisition activities. The City offers affidavits from its engineer, Norman Baldwin, and VTrans' Right-of-Way Acquisition Chief, Bruce Melvin, in support of the assertion that VTrans undertook valuation and acquisition activities related to the Project as early as March 14, 2016, and possibly before. These activities included initiating appraisals and waiver valuations, as well as entering into the negotiation process with property owners. The affidavits also support the City's assertion that VTrans began negotiating with property owners at least as early as August 2, 2016. The City's discovery responses and a billing summary for the Project further corroborate the City's statements.

While Fortieth generally asserts a dispute of material fact regarding this issue, it does not specifically dispute or address VTrans' 2016 activities. See V.R.C.P. 56(e) ("Failing to Properly Support or Address a Fact"). Further, Fortieth does not support its generalized assertion of a dispute with evidentiary material in the record. See V.R.C.P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . specific citations to particular parts of materials in the record . . . ."). In the absence of specific and supported assertions of genuinely

12

controverted facts, bare allegations of a dispute do not foreclose the possibility of summary judgment. See Morrill House, LLC, 2011 VT 117, ¶ 7; see also Webb, 2007 VT 65, ¶ 14 (citation omitted).

Perhaps more importantly, Fortieth does not premise its opposition to the City's motion on any dispute of fact. Instead, Fortieth argues that VTrans did not "initiate[] right-of-way valuation activities" until VTrans finalized its right-of-way plan in April 2018, or until the May 2018 necessity hearing. Thus, the dispute does not center on the specific acquisition activities VTrans or the City carried out on certain dates, which would implicate questions of fact, but on what types of activity qualify under the transition clause, which presents the Court with a question of law amenable to summary judgment.

Fortieth also argues that the City's reliance on Mr. Melvin's affidavit is improper because the City did not disclose him as a fact or expert witness in response to Fortieth's first set of interrogatories. Fortieth alleges that Mr. Melvin offers facts not previously disclosed in discovery, which this Court should either disregard or allow Fortieth time to develop.

We first note that Mr. Melvin's statement contains essentially the same facts as Mr. Baldwin's affidavit—an affidavit (and associated facts) that Fortieth does not contest. Fortieth does not identify which of these duplicated facts are new. Further, nonmovants asserting that certain facts are unavailable to them must show "by affidavit" that, "for specified reasons," they cannot provide the necessary facts. V.R.C.P. 56(d). Fortieth presents this issue in a footnote, not an affidavit. Also, Fortieth does not describe which facts it needs to develop, or why it has been unable to do so during the discovery process. Also, as noted, Fortieth presents the Court with a legal theory as to why the transition clause does not apply, not a potential factual issue.

For these reasons, we conclude that there is no genuine dispute of material fact barring summary judgment. Accordingly, we must proceed to consider whether the City is entitled to judgment as a matter of law on this issue, which requires the Court to interpret the transition clause.

To determine what "initiat[ing] right-of-way valuation activities" entails, and whether VTrans' actions fall within this phrase, we apply the ordinary rules of statutory and regulatory construction. See Williston Inn Grp., 2008 VT 47, ¶ 14 (citing In re 1650 Cases of Seized Liquor,

168 Vt. 314, 319 (1998)).  In so doing, our ultimate goal is to discern the intent of the drafters. Conservation Law Found. v. Burke, 162 Vt. 115, 121 (1993).

We begin with the plain meaning of the regulatory language, giving effect to the whole and every part of the regulation.  In re Hamid-Ahmed, 2018 VT 113, ¶ 7 (citing City of Burlington v. Dep't of Emp't & Training, 148 Vt. 151, 154 (1987)).  If the plain meaning is not apparent, this Court "must ascertain legislative intent through consideration of the entire [regulation], including its subject matter, effects and consequences, as well as the reason and spirit of the law."  State of Vt. Agency of Nat. Res. v. Parkway Cleaners, 2019 VT 21, ¶ 16 (citing In re Estate of Cole, 2004 VT 17, ¶ 10, 176 Vt. 293).  We consider the regulation alongside any related parts of the regulatory scheme "to create, if possible, a harmonious whole."  Id.

The 2017 VSMM does not define the phrase "initiated right-of-way valuation activities," nor does it define the component parts of the phrase aside from defining "right-of-way," which does not aid our inquiry.  As the plain language of the phrase also does not shed much light on what activities qualify, we consider how the term fits within the broader regulatory scheme.

Fortieth asserts that a right-of-way plan marks the beginning of the right-of-way valuation process, so VTrans' April 18, 2018 right-of-way plan came too late to implicate the transition clause.  The City disagrees, asserting that the right-of-way plan is a substantial and highly technical document that requires a significant amount of upfront valuation and appraisal work to produce.  Both parties rely on VTrans' Right-of-Way Manual ("ROW Manual"), as well as VTrans' Local Transportation Facilities Guide to the Right-of-Way Phase ("LTF ROW Guide"), to support their descriptions of right-of-way plans.[10]

Both documents show the detailed and elaborate nature of right-of-way plans.  As described in the ROW Manual, right-of-way plans "contain the final project design features, including, but not limited to, the project centerline, construction limits, structures, drainage, and

---

[10] The ROW Manual directs VTrans' right-of-way acquisition process and agents of VTrans are required to follow the ROW Manual when acquiring land.  It was designed to comply with Vermont and Federal statutes, including 23 C.F.R. § 710 and 49 C.F.R. § 24.  The Federal Highway Administration certified that the ROW Manual meets the requirements of 23 C.F.R. § 710 on June 13, 2012.

The LTF ROW Guide is a less formal document, but it contains much of the same information and also references the federal regulations, where applicable.  VTrans published the LTF ROW Guide to aid municipalities and other groups acquiring property for federally funded transportation projects.

topography." ROW Manual § 2-5 (emphasis added). Right-of-way plans are filed in conjunction with necessity hearings, which, if the petitioner demonstrates the "necessity" of its project, result in authority to institute condemnation proceedings. See 19 V.S.A. § 710; 19 V.S.A. § 501(1) (defining "necessity"); ROW Manual § 3-54 (defining "necessity hearing"). This, in combination with the fact that right-of-way plans are filed in the municipality's land records office and become "permanent public records," requires the plans to be in final form. ROW Manual § 2-5.

Further, the plans are referenced to provide title and technical data essential to the land acquisition process. Id. Extensive title research is necessary to complete the plan. LTF ROW Guide at 4. Both the ROW Manual and the LTF ROW Guide set out lengthy lists detailing further requirements of right-of-way plans, including detailed design data, identification of all affected utilities, and a description of all encumbrances on affected properties. ROW Manual §§ 2-6–2-18; LTF ROW Guide at 11-13.

The ROW Manual also defines a number of activities that must precede a final right-of-way plan. Most notable among these are contacting property owners, in-depth title abstracting, and creating preliminary plans. See ROW Manual §§ 2-19–2-21, 2-28–2-30, 2-31.

Based on the foregoing, it is apparent that right-of-way plans require a substantial amount of upfront effort and investment. As the formal document evaluated in the necessity hearing, the document eventually recorded in the land records office, a right-of-way plan defines the land to be acquired with finality. The extensive detail and final nature of right-of-way plans undermine Fortieth's assertion that "[t]he [ROW Manual] provides that the right-of-way plans shall precede and must be completed before negotiation or other stages of the right of way process can commence." Appellant's Opp'n to Mots. for Summ. J., 14 (June 13, 2019). Instead, by the time a petitioner finalizes their right-of-way plan they have already proceeded quite a way down the path of right-of-way valuation and acquisition.

The transition clause does not define the qualifying "right-of-way valuation activit[y]" as the submission of the right-of-way plan or the necessity hearing. ANR could have simply referenced these distinctive milestones in the land acquisition process as the events triggering

15

the transition clause. Instead, ANR made use of broader phrasing and did not incorporate these readily identifiable procedural steps.[11]

Further, necessity hearings may give government bodies the right to initiate condemnation proceedings but the 2017 VSMM only refers to valuation activities. As these terms mark separate and distinct aspects of the land acquisition process, and we presume ANR chose its words deliberately, we conclude that the transition clause is not referring to the activities Fortieth offers.

Accordingly, we conclude that VTrans "initiated right-of-way valuation activities" in early- to mid-2016 with its negotiation, appraisal, and waiver valuation activities. Pursuant to the transition clause, the 2002 VSMM applies to the Project, as the City has made it clear that it is not choosing to apply the 2017 VSMM.[12]

**Conclusion**

As discussed above, we afford ANR deference and adopt its characterization of the 90-day term as an internal administrative rule that ANR could apply flexibly. We conclude that the City and ANR's noncompliance with the 90-day term does not present a procedural impediment to this Court's assessment of the City's renewal application or require the City to seek an entirely new permit.

In addition, because the City and VTrans initiated right-of-way valuation activities before the January 1, 2017 deadline specified in the 2017 VSMM's transition clause, we conclude that the City can avail itself of the clause and apply the 2002 VSMM to the Project.

Fortieth has submitted a Statement of Questions and a Clarified Statement of Questions that contain multiple questions relevant to these two issues. This Decision resolves Questions 1 and 14 of the original Statement of Questions. With respect to the Clarified Statement of Questions, this Decision answers or moots Questions 3(b), 7(a), 7(e), 8, and 13(a).[13] Generally,

---

[11] While agency deference is not as appropriate in this context as in Section I, especially since ANR does not take a position on this issue on summary judgment, we note that ANR concluded that the transition clause did include the Project and applied the 2002 VSMM below. See Permit No. 3368-INDS.RAR, ¶ 13.

[12] Having reached this conclusion, we do not consider the City's second argument that the acquisition activities for the South Connector in the 1980s qualify under the transition clause.

[13] While Fortieth did not include lettered subparts in its Clarified Statement of Questions, each Question contained multiple subsections presented as different paragraphs. Each of the lettered subparts specified here corresponds to a different paragraph.

any Questions premised on the Project's compliance with the 2017 VSMM are not relevant to this appeal.

As Fortieth's other Questions remain unresolved, we direct the Court Manager to set this matter for a status conference at the next available opportunity, so that the Court and the parties may discuss final trial preparations.

Electronically signed on August 21, 2018 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division